**ESTATE of Sam E. BROADHEAD, Deceased, et al., Petitioners,**

v.

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 23998.**

United States Court of Appeals Fifth Circuit.

March 5, 1968.

---

deQuincy V. Sutton, Meridian, Miss., for petitioners.

Lester R. Uretz, Chief Counsel, Christopher J. Ray, Atty., Internal Revenue Service, Mitchell Rogovin, Asst. Atty. Gen., Lee A. Jackson, Carolyn R. Just, Robert N. Anderson, Attys., Dept. of Justice, Washington, D. C., for respondent.

Before GEWIN, BELL and AINSWORTH, Circuit Judges.

AINSWORTH, Circuit Judge:

Taxpayer[1] has petitioned for review of an adverse decision of the Tax Court relating to federal income tax deficiencies assessed by the Commissioner of Internal Revenue for the taxable years 1956, 1958, 1959 and 1960.

Jurisdiction to review decisions of the Tax Court is conferred by 26 U.S.C. § 7482, which provides that the review shall be in the same manner and to the same extent as decisions of the district court in civil actions tried without a jury, thus imposing the clearly erroneous standard of Rule 52(a), Federal Rules of Civil Procedure. Cf. United States v. Snyder Brothers Company, 5 Cir., 1966, 367 F.2d 980, 984. The scope of review, however, is limited. Imbesi v. C. I. R., 3 Cir., 1966, 361 F.2d 640, 643; C. I. R. v. Duberstein, 363 U.S. 278, 80 S.Ct. 1190, 4 L.Ed.2d 1218 (1960). If the findings are supported by substantial evidence upon the record as a whole, and not against the clear weight of the evidence or induced by an erroneous view of the law, they cannot be upset. C. I. R. v. Riss, 8 Cir., 1967, 374 F.2d 161, 166. See also J. Gordon

---

1. Petitioners are Estate of Sam E. Broadhead, deceased, S. Norris Broadhead and Paul E. Broadhead, executors, and Verdie Cox Broadhead, his widow, and for convenience we will refer to them in this opinion as "taxpayer."

Turnbull, Inc. v. C. I. R., 5 Cir., 1967, 373 F.2d 87, 90. The Commissioner's deficiency assessments are presumptively correct and the burden is on the taxpayer to show that his determination is invalid; and where the taxpayer offers no substantial evidence to overcome the presumption of correctness, the Tax Court's findings must be affirmed. C. I. R. v. Riss, supra.

## I.

In 1955 taxpayer contracted with the owner to purchase all merchantable timber on certain Louisiana land for $252,-412.57. Later, in the same year, he executed a sales contract with a buyer to cut all of the merchantable pine and cypress on the tract. Also, in the same year, he contracted with another buyer to cut all of the merchantable hardwood timber on this tract. The buyers were to pay for the timber at a stated rate per unit of measure as they cut the timber. Under

these purchase contracts taxpayer received $119,362.87 in 1955 and $124,467.-88 in the year 1956. Thus his net loss on the transaction was $8,581.82 for which he claimed a deduction in the year 1956 when the transaction was concluded.

■■ The Commissioner determined that the net loss of $8,581.82 should be allocated by a deduction of $5,328.10 in 1955 and $3,253.72 in 1956 on the basis of depletion losses allowed as the timber was severed in each year. We agree with the Tax Court's finding, supporting the Commissioner's determination, that taxpayer's recovery of costs by depletion allowance should be made as the timber is cut and that a yearly depletion allowance based on timber severed in each year is proper under Section 611(a) of the Internal Revenue Code of 1954 (26 U.S.C. 1964 ed., § 611(a))[2] and applicable regulations thereunder. See also Treas.Reg. (1954 Code) § 1.611–1(a) (b).[3] Tax-

2. § 611. Allowance of deduction for depletion

(a) General rule.—In the case of mines, oil and gas wells, other natural deposits, and timber, there shall be allowed as a deduction in computing taxable income a reasonable allowance for depletion and for depreciation of improvements, according to the peculiar conditions in each case; such reasonable allowance in all cases to be made under regulations prescribed by the Secretary or his delegate. For purposes of this part, the term "mines" includes deposits of waste or residue, the extraction of ores or minerals from which is treated as mining under section 613(c). In any case in which it is ascertained as a result of operations or of development work that the recoverable units are greater or less than the prior estimate thereof, then such prior estimate (but not the basis for depletion) shall be revised and the allowance under this section for subsequent taxable years shall be based on such revised estimate.

3. § 1.611–1 Allowance of deduction for depletion (in pertinent part):

(a) Depletion of mines, oil and gas wells, other natural deposits, and timber—(1) In general. Section 611 provides that there shall be allowed as a deduction in computing taxable income

in the case of mines, oil and gas wells, other natural deposits, and timber, a reasonable allowance for depletion. In the case of standing timber, the depletion allowance shall be computed solely upon the adjusted basis of the property. In the case of other exhaustible natural resources the allowance for depletion shall be computed upon either the adjusted depletion basis of the property (see section 612, relating to cost depletion) or upon a percentage of gross income from the property (see section 613, relating to percentage depletion), whichever results in the greater allowance for depletion for any taxable year. In no case will depletion based upon discovery value be allowed.

(b) Economic interest. (1) Annual depletion deductions are allowed only to the owner of an economic interest in mineral deposits or standing timber. An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship, income derived from the extraction of the mineral or severance of the timber, to which he must look for a return of his capital. But a person who has no capital investment in the mineral deposit or standing timber does not possess an economic in-

payer's receipts should therefore have been reported in the years received and the depletion allowance applicable should also have been deducted in each of these years. See Section 451(a) of the Internal Revenue Code of 1954 (26 U.S.C. 1964 ed., § 451(a)).[4]

## II.

■■ Taxpayer guaranteed advances of money by Wells Lumber Company to Delta Hardwood Lumber Corporation, a corporation owned by his children and financed by him. As a result of this guarantee, he was required to pay Wells $9,945 in 1958, for which he claims a deductible business loss in that year. Taxpayer contends that his guarantee to Wells on behalf of Delta was made in connection with his overall timber selling operations for the year and was proximately a part of his business. The Tax Court considered taxpayer's contentions and analyzed the evidence as to whether the guarantee to Wells for Delta indebtedness was a business obligation or the mere guarantee of a loan of Wells to Delta because taxpayer's children were the owners of Delta. The Tax Court found that "The evidence is far from clear that petitioners' guarantee of the loan was not because of a desire to assist their children." We are unable to say on this record that this finding was clearly erroneous. Such a deduction is properly disallowed where the guarantee of the loan is not related to or proximately con-nected with the taxpayer's trade or business. Whipple v. C. I. R., 373 U.S. 193, 83 S.Ct. 1168, 10 L.Ed.2d 288 (1963), rehearing denied 374 U.S. 858, 83 S.Ct. 1863, 10 L.Ed.2d 1082 (1963).

## III.

On August 1, 1957, taxpayer borrowed $425,000 from Connecticut General Life Insurance Company, securing his note in that amount by first mortgage on certain Arkansas lands. On October 30, 1957, taxpayer borrowed $825,000 from Connecticut General and secured his note in that amount by first mortgage on a North Carolina tract. According to the terms of the loans with Connecticut General, the first mortgage on the North Carolina tract was also a second mortgage on the Arkansas lands, and the first mortgage on the Arkansas lands was a second mortgage on the North Carolina tract. In February 1958, taxpayer sold to M. J. Eubanks the Togo Island lands in Mississippi and Louisiana for $462,500, in part payment of which Eubanks furnished taxpayer his note in the sum of $437,500. On June 13, 1958, taxpayer sold the Arkansas lands to M. J. Eubanks for the price of $1,625,000, of which the sum of $1,525,000 was evidenced by a note from Eubanks to taxpayer, secured by deed of trust on the lands. Eubanks took the Arkansas lands subject to the prior mortgage of $425,000 (which he did not, however, assume) given by taxpayer on August 1, 1957 to Connecticut General.[5]

terest merely because through a con-tractual relation he possess a mere eco-nomic or pecuniary advantage derived from production. For example, an agree-ment between the owner of an economic interest and another entitling the latter to purchase or process the product upon production or entitling the latter to com-pensation for extraction or cutting does not convey a depletable economic inter-est. Further, depletion deductions with respect to an economic interest of a corporation are allowed to the corpora-tion and not to its shareholders.

4. § 451. General rule for taxable year of inclusion

    (a) General rule.—The amount of any item of gross income shall be included in the gross income for the taxable year in which received by the taxpayer, unless, under the method of accounting used in computing taxable income, such amount is to be properly accounted for as of a different period.

5. The deed provided: "There are two deeds of trust or mortgages outstanding against the described property, each

On August 5, 1958, taxpayer sold the North Carolina tract to W. A. Powe, Bryant and associates for $2,419,250. Purchasers paid $229,250 in cash, furnished taxpayer a note for $940,000 secured by mortgage on the North Carolina tract and assumed taxpayer's outstanding mortgage indebtedness to Connecticut General of $1,250,000 represented by the two notes and mortgages of $825,000 and $425,000 heretofore given by taxpayer to Connecticut General in 1957. The $425,000 indebtedness assumed was the one secured by first mortgage on the Arkansas lands which taxpayer had sold to Eubanks and on which, as of February 1959, there remained an outstanding principal balance of $397,000.

In 1959 Eubanks rearranged his indebtedness and with taxpayer's assistance obtained a loan from Connecticut General of $1,825,000 secured by first mortgages on certain lands of Eubanks, including the Togo Island tract and the Arkansas lands which he had purchased from taxpayer. In connection with Eubanks' debt rearrangement, Connecticut General required release of the existing mortgages on the Arkansas lands and payment out of the loan of the $425,000 first mortgage debt of taxpayer to Connecticut General, which had been assumed by the Powe group and on which there remained an unpaid balance of $397,000. Accordingly, this was done and when the transaction was completed taxpayer credited Eubanks with $397,000 on the balance of

the purchase price of the Arkansas lands still due him, and Eubanks reduced his debt to taxpayer by that amount. The Powe group having been thus relieved of the payment of the balance on the $425,000 mortgage on the Arkansas lands which it had assumed to pay in connection with its purchase of the North Carolina tract, agreed to increase the amount of obligation to taxpayer for the North Carolina lands by the identical sum of $397,000. Accordingly, a new note for $1,337,000 [$940,000, the amount of the original note, plus $397,000] was furnished to taxpayer by the Powe group and the indebtedness was secured by deed of trust on the North Carolina tract. The Powe group's total obligations thus remained the same as before.

The question for decision is whether taxpayer received constructive payment of the sum of $397,000 by this unique and complex multiparty transaction. Eubanks' indebtedness to taxpayer before the refinancing with Connecticut General totaled $1,962,500 [$1,525,000 and $437,500 evidenced by two notes]. After the debt rearrangement, Eubanks had reduced his indebtedness to taxpayer by $397,000 by paying taxpayer's first mortgage indebtedness to Connecticut General on the Arkansas lands in that amount. Eubanks also at that time paid taxpayer $407,189.07 in cash and his remaining indebtedness to taxpayer was $1,139,833.64 for which he furnished a note in lieu

signed by grantors herein, and each in favor of Connecticut General Life Insurance Company, a corporation organized and existing under the laws of the State of Connecticut. One of these deeds of trust or mortgages secured the payment of $425,000.00 and the other secured the payment of $825,000.00. The said indebtedness are also secured by deeds of trust or mortgages on approximately 73,000 acres of land lying, being and situated in Hyde County, North Carolina, and owned by Sam Broadhead."

It also provided: "Grantee [Eubanks] purchases the described property subject to the deeds of trust and the terms thereof in favor of Connecticut General Life Insurance Company aforesaid, but grantors [Broadhead] agrees to pay the indebtedness owing Connecticut General Life Insurance Company according to the obligation of his note and of his deeds of trust and mortgages."

of the former notes.[6] Eubanks therefore paid the outstanding indebtedness of taxpayer to Connecticut General of $397,000. This constituted a constructive receipt to taxpayer in said sum.

As to this matter the Tax Court said: "Our best interpretation of the facts is that Eubanks used his funds by way of loans from Connecticut General to pay a mortgage, payment of which had been assumed by the Powe group with the understanding that the Powe group would give a note to petitioners [taxpayer] for the $397,000 so used as a payment of part of the purchase price of the Togo Island and Arkansas tracts." The Tax Court said: "Viewed in this manner petitioners [taxpayer] received property other than indebtedness of the purchasers for the Togo Island and Arkansas tracts as a part of the payment of the purchase price of such tracts when they received the new Powe group note increased by $397,000.

Such property is to be considered as payment on the purchase price of the Togo Island and Arkansas tracts in 1959, to the extent of fair market value of the note which, insofar as the record here shows, is the face value thereof of $397,000."

In our view Eubanks, by paying taxpayer's outstanding indebtedness of $397,000 to Connecticut General, thus made a payment actually due by taxpayer and received credit from taxpayer for that amount on account of the purchase price due on the Togo Island and Arkansas tracts. Taxpayer was thereby required to show a collection of $397,000 in the year 1959 on account of the sale of these tracts to Eubanks and to report whatever profit was realized considering his original basis. The discharge of indebtedness may result in the realization of income. Treas.Reg. (1954 Code) § 1.61–12(a).[7] Income, although not actu-

6. The record discloses that petitioners (taxpayer) entered this transaction on their journal as follows:

| | | |
|---|---:|---:|
| Note (1958) on Arkansas unpaid | $1,525,000.00 | |
| Note (1958) on Togo (after oil well credit) | 437,500.00 | $1,962,500.00 |
| Add: Price increase for resale 1959 | | 107,000.00 |
| Total debt due by Eubanks on resale | | $2,069,500.00 |
| Deduct: Payment of vendor lien on Togo | 112,635.49 | |
| Transfer to Powe etc. to Ark. first mortgage | 397,000.00 | |
| Interest paid by Eubanks to Conn. Gen. to date of resale | 12,505.50 | |
| Price concession on resale | 500.00 | 522,640.99 |
| Balance: New note, excluding separate (3) notes | | 1,546,859.01 |
| Less: Cash paid on resale | 377,189.70 | |
| | 30,000.00 | 407,189.70 |
| Balance for settlement | | $1,139,669.31 |
| Add: 2 days of interest excessively paid Conn. Gen. | | 164.33 |
| Balance: Note of Eubanks | | $1,139,833.64 |

7. § 1.61–12 Income from discharge of indebtedness (in pertinent part):

(a) *In general.* The discharge of indebtedness, in whole or in part, may result in the realization of income. If, for example, an individual performs services for a creditor, who in consideration thereof cancels the debt, the debtor realizes income in the amount of the debt as compensation for his services. A taxpayer may realize income by the payment or purchase of his obligations at

ally reduced to a taxpayer's possession, is constructively received by him in the taxable year during which it is credited to his account. Treas.Reg. (1954 Code) § 1.451–2.[8]

### IV.

■ Taxpayer held a second mortgage on certain lands in Arkansas and Mississippi sold to M. J. Eubanks on which Connecticut General Life Insurance Company held the first mortgage. Eubanks defaulted in his payments to Connecticut General in 1960 and taxpayer commenced foreclosure proceedings on his second mortgage. On August 2, 1960, subsequent to the filing of foreclosure proceedings by taxpayer against Eubanks, taxpayer paid $128,787.15 to Connecticut General, which payment included $48,419.08 of interest and $2,966.28 reimbursement of expenditures due by Eubanks to Connecticut General and which Eubanks had failed to pay. On August 5, 1960, taxpayer bid in the Mississippi property at foreclosure sale and on August 27, 1960, bid in the Arkansas property at foreclosure sale. He then claimed deductions for the year 1960 for $48,419.08 of interest and $2,966.28 reimbursement of expenditures. At the time taxpayer made his payment to Connecticut General, he was not the owner of the Mississippi and Arkansas properties but held a mortgage thereon and had instituted foreclosure proceedings. The Tax Court was correct in upholding the Commissioner's determination that these payments of interest and expenditures by taxpayer for Eubanks' account were not deductible since an interest payment on another's debt is not a deductible item. As the Tax Court found, the Commissioner properly treated such payments as an addition to the taxpayer's basis in the properties. These payments were made in order to acquire title and to satisfy the first mortgage holder. They should properly have been capitalized rather than deducted as an item of expense in the year of payment. See Magruder v. Supplee, 316 U.S. 394, 397, 398, 62 S.Ct. 1162, 1165, 86 L.Ed. 1555 (1942); United States v. Albertson Company, 9 Cir., 1955, 219 F.2d 920.

### V.

■ The taxpayer's claim of a deductible loss in 1960 of $616,765.56 in connection with the various worthless debts in connection with various sales of properties in prior years had no support or proof in the record and, there being no evidence of worthlessness in 1960, was properly disallowed by the Commissioner and we affirm the Tax Court's ruling which denied the motion for modification of its opinion to reflect the alleged loss. See Boehm v. Commissioner of Internal Revenue, 326 U.S. 287, 294, 66 S.Ct. 120, 124, 90 L.Ed. 78 (1945); White v. United States, 305 U.S. 281, 292, 59 S.Ct. 179, 184, 83 L.Ed. 172 (1938).

The decision of the Tax Court is in all respects affirmed.

---

less than their face value. In general, if a shareholder in a corporation which is indebted to him gratuitously forgives the debt, the transaction amounts to a contribution to the capital of the corporation to the extent of the principal of the debt.

**8.** § 1.451–2 Constructive receipt of income (in pertinent part):

(a) *General rule.* Income although not actually reduced to a taxpayer's possession is constructively received by him in the taxable year during which it is credited to his account, set apart for him, or otherwise made available so that he may draw upon it at any time, or so that he could have drawn upon it during the taxable year if notice of intention to withdraw had been given. However, income is not constructively received if the taxpayer's control of its receipt is subject to substantial limitations or restrictions. * * *