JAMES A. REECE and GLADYS W. REECE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Reece v. Commissioner
Docket No. 2955-74.
United States Tax Court
T.C. Memo 1977-69; 1977 Tax Ct. Memo LEXIS 373; 36 T.C.M. (CCH) 299; T.C.M. (RIA) 770069; March 16, 1977, Filed Harlan Dodson, III, for the petitioners. William Robert Pope, Jr., for the respondent. FEATHERSTON
MEMORANDUM FINDINGS OF FACT AND OPINION FEATHERSTON, Judge: Respondent determined the following deficiencies in petitioners' Federal income taxes: 1969
$27,158.57
1970
$ 4,079.91
The issue for decision is whether petitioners' unrepaid advances of funds to a wholly owned corporation, R & W Food Services, Inc., should be classified as business bad debts under section 166(a), [1]/ nonbusiness bad debts under section 166(d), or expenses incurred and paid in petitioners' trade or business under section 162(a). FINDINGS OF FACT Petitioners James A. Reece and Gladys W. Reece, husband and wife, were legal residents of Clarksville, Tennessee, at the time their *375 petition was filed. Petitioners filed joint Federal income tax returns for 1969 and 1970 with the Southeast Service Center, Chamblee, Georgia. James A. Reece (hereinafter petitioner) has been in the construction business since 1952 and, for the years in issue, operated a sole proprietorship known as J. A. Reece Construction Company (hereinafter Reece Co.). Petitioner is an engineer and his construction business, involving primarily the installation of water and waste treatment plants, has been consistently profitable since its inception. The operation of his construction business required petitioner to obtain bonds to assure the completion of his contracts. In most cases obtaining a surety bond was necessary as a condition to the submission of bids for construction projects. Between 1965 and early 1973, petitioner obtained his surety bonds through Martin A. Hayes & Company, a Nashville, Tennessee, bonding agency. Although petitioner maintained a solid record of profit and performance in his construction business, his lack of overall financial strength during 1965 and 1966 caused the bonding agency to limit the size of bonds provided petitioner. During 1966 and 1967, petitioner's *376 bonding capacity was marginal and attempts to obtain bonds resulted in numerous inquiries by the bonding agency. Petitioner's bonding capacity during this period was further diminished by his entry into two unsuccessful investment ventures. One of these investments was a model car racing center petitioner operated during 1966. By November 4, 1966, this venture had lost $27,000. The other unsuccessful venture was an investment in a building located at Fort Campbell, Kentucky. One of the bonding agencies utilized by petitioner suggested as early as January 1967 that petitioner liquidate all of his outside business ventures and devote his resources to his construction business. However, the bonding agency's representative recognized that the disposal of petitioner's outside investments had to be extended over a period of time to avoid substantial losses on their liquidation. Notwithstanding those difficulties with outside investments, petitioner made another one in 1968. On March 11, 1968, a charter of incorporation for R & W Food Service, Inc. (hereinafter R & W), a corporation formed for the operation of a cafeteria, was filed with the office of the Tennessee Secretary of *377 State. Prior to his investment in R & W, petitioner discussed the advisability of the investment with his banker and bonding agent, and they advised him against any investment outside his construction business. Petitioner was informed that should he lose any substantial sum, both his bonding capacity and his credit line would be severely impaired if not altogether terminated. Nonetheless, he proceeded with the investment. At the first meeting of R & W's board of directors on March 13, 1968, the board unanimously resolved that all the corporation's stock was to be issued to petitioner in return for his payment of $17,000 to the corporation. This resolution was the corporation's ratification of an agreement executed on March 4, 1968, between petitioner and the incorporators. The cafeteria was located in a building which had been previously leased by petitioner for his model car raceway business. Petitioner's lessor allowed petitioner to sublease the building to R & W, but petitioner remained the primary obligor of the lease. On March 8, 1968, equipment necessary to operate the cafeteria was purchased by R & W at a total cost of $29,851.65 from Wolfe Sales Company. Petitioner *378 was required by Wolfe Sales Company to join with R & W in signing the purchase documents.Of petitioner's $17,000 capital investment, $15,000 was used as a cash downpayment on the initial equipment purchase, leaving only $2,000 of liquid capital remaining. On September 4, 1968, an additional $7,326.40 was expended for equipment for use by R & W, and the sales contract was signed by both R & W and petitioner. On March 21, 1968, petitioner presented a proposal to R & W's board of directors whereby R & W would borrow operating funds from various individuals. The proposal was to allow R & W to repay the loans in stock or cash at the option of the lender 2 years after the date of the loan agreement. Repayments were to be based on the greater of a specified rate of interest or a percentage of R & W's profits. The proposal was approved by the board of directors. During March and April 1968, eight of these loan agreements were entered into by the corporation. The following schedule reflects the name of each of these third parties and the amount which was advanced to R & W, as well as the date and amount of repayment in satisfaction of these agreements: Repayment Name
Amount
Date
Amount
L. J. Dancey
$ 5,000
1/31/71
$ 5,525.00
Howard A. Gossett
1,000
8/20/70
1,083.23
Joe Kenneth Terrell, Jr.
1,000
8/20/70
1,083.91
Phillips Elliott
1,000
8/20/70
1,083.23
Horace Clark
3,000
8/20/70
3,249.50
Radio Station WJZM
1,000
7/20/70
1,075.85
W. G. Ladd
1,000
8/20/70
1,079.93
Boot-Ster Manufacturing
Co., Inc.
1,000
8/20/70
1,082.89
Total
$14,000
$15,263.54
*379 Petitioner had guaranteed repayment of each of these loans. At a meeting of R & W's board of directors on May 15, 1969, petitioner was authorized as its president to execute an employment agreement with Joseph E. Henning (hereinafter Henning), who was hired to become R & W's new general manager. Henning's employment commenced on June 1, 1969, at a salary of $1,000 per month. Petitioner, individually, guaranteed the payment of Henning's salary and moving expenses. R & W was not a financial success. In July 1969, petitioner began negotiations for the sale of R & W's business to Snack Time Systems, Inc. (hereinafter Snack Time). On July 11, 1969, R & W's board of directors approved the transfer of R & W's assets to Snack Time in exchange for 72,000 shares of Snack Time stock and, concurrently, the sale of 36,000 shares of Snack Time stock to three individuals. On July 15, 1969, the sales agreement between R & W and Snack Time was formally executed. Although the parties to the sale had earlier agreed that petitioner would remain liable on the equipment mortgages, the contract of sale stated that Snack Time, as the buyer, would accept liabilities for a maximum of $12,000 of *380 the liens outstanding on the equipment. As was R & W's experience, Snack Time's operation of the cafeteria was unprofitable and it became delinquent in paying its debts. Petitioner was called upon by Snack Time's creditors to pay the obligations he had guaranteed. On October 29, 1969, R & W repurchased the cafeteria assets from Snack Time. The repurchase was designed to place the parties in the same position as they had been prior to Snack Time's acquisition of the cafeteria in July 1969. As a result of the repurchase, R & W again became responsible for obligations incurred in the cafeteria operation. By letter dated November 24, 1969, petitioner advised various patrons of R & W that the business was to be sold at auction on December 17, 1969, and the sale was to be effective as of January 1, 1970. R & W's assets were offered for sale at an auction on December 17, 1969, but the auction did not produce a buyer. By letter dated March 5, 1970, petitioner notified R & W's customers that the cafeteria would cease operations on March 31, 1970. The cafeteria closed its doors to the general public on March 15, 1970, but continued to satisfy commitments to various clubs and special *381 groups through March 31, 1970. Although petitioner sustained substantial losses from his investment in R & W, Martin A. Hayes & Company continued to meet the bonding requirements of his construction business until 1973. Thereafter, petitioner was able to obtain the necessary bonds from other agencies and continued his construction business. Petitioner's records of his advances to R & W consist of a notes receivable account for R & W beginning with March 1968 and running through December 1970. The following schedule is a record of petitioner's advances to R & W and amounts repaid by R & W: Repayments by
Payments to or on
R & W and Other Date
Behalf of R & W
Adjustments
1968
March 13
$16,000.00
March 28
1,000.00
April 9
$ 6,000.00
April 22
4,000.00
May 1
10,000.00
May 23
3,500.00
May 27
4,000.00
June 26
13,000.00
July 22
4,000.00
Aug. 22
3,000.00
Sept. 24
3,000.00
Sept. 26
3,000.00
Oct. 22
3,500.00
Oct. 29
4,000.00
Nov. 21
3,000.00
Dec. 4
3,000.00
Dec. 5
3,000.00
Dec. 31
1,062.50
1969
Jan. 3
1,000.00
Jan. 22
3,000.00
Jan. 28
3,000.00
Jan. 29
2,000.00
Feb. 19
$ 2,500.00
Feb. 24
5,000.00
March 25
3,000.00
March 31
1,000.00
April 10
1,500.00
407.08
April 15
5,000.00
April 30
2,000.00
May 16
3,000.00
May 23
4,000.00
May 28
200.00
June 3
3,000.00
July 21
3,000.00
July 24
2,000.00
July
3,540.00
Aug. 1
2,500.00
Aug. 11
2,000.00
Aug. 22
1,500.00
Sept. 8
400.00
Sept. 23
1,000.00
Nov. 11
2,000.00
Nov. 24
3,500.00
Dec.
1,961.71
Dec. 18
500.00
Dec. 23
1,000.00
Dec. 31 Adj. Entries
$33,166.20
1970
Jan. 21
3,000.00
6,008.07
Feb. 10
1,400.00
Feb. 23
3,500.00
March 20
1,463.75
467.78
1,100.00
April 10
1,500.00
April 20
1,000.00
April 30
500.00
May 15
$ 5,000.00
May 26
$ 5,279.92
June 4
1,544.73
June 22
1,738.08
July 23
6,000.00
8,000.00
9.42
July 20
1,075.85
July 23
9.00
Aug. 4
1,635.00
Aug. 27
5,874.01
Oct. 19
692.23
Oct. 23
285.54
Nov. 11
543.99
Nov. 30
19.00
Dec. 31 Adj. Entries
5,641.09
*382 According to the above schedule, the balances at the end of 1969 and 1970, after adjusting entries, owing to petitioner were $69,280.09 and $13,949.28, respectively. On his 1969 and 1970 joint Federal income tax returns, petitioner deducted $66,463.67 and $14,606.30, respectively, as business bad debt deductions. Respondent disallowed these deductions in the amounts of $65,980.09 and $12,891.47, respectively, but allowed them as nonbusiness bad debts. OPINION Respondent maintains that the loans petitioner made to R & W and the subsequent worthlessness of those loans resulted in nonbusiness bad debts within the meaning of section 166(d)(2), [2]/ and, accordingly, petitioner must treat those worthless debts as short-term capital losses under section 166(d)(1) instead of ordinary losses as claimed on his Federal income tax return. In support of his position, respondent contends that the advances by petitioner to R & W were motivated by his need to protect his capital investment in the cafeteria business and were not proximately related to his construction business. *383 Petitioner, on the other hand, argues that the advances of funds to R & W, made pursuant to various guarantees, were proximately related to his construction business. He contends that the advances of funds were made in an attempt to protect his business reputation which would have been severely damaged had R & W defaulted on its debts. Petitioner claims that had he allowed R & W to default on its debt obligations or go into bankruptcy, his ability to obtain the surety bonds necessary to his construction business would have been seriously impaired if not altogether terminated. At the outset, it is necessary to point out that respondent does not deny that the debts here involved became worthless in 1969 and 1970, or that petitioner has correctly computed the amounts of his losses. The only controverted issue is the nature of the worthless debts--whether they were business or nonbusiness bad debts. In general terms, section 166 allows a deduction for the amounts of any bona fide debts which become worthless during a taxable year. The nature of the deduction, however, depends upon whether they are business or nonbusiness in character. Ordinary loss treatment is allowed for business *384 bad debts, and short-term capital loss treatment is prescribed for nonbusiness bad debts. [3]/ Whether a debt is to be classified as a business or nonbusiness debt is a question of fact. In order to be classified as a business bad debt, the worthless debt must bear a proximate relation to the taxpayer's trade or business. United States v. Generes,405 U.S. 93, 102 (1972); Whipple v. Commissioner,373 U.S. 193, 204 (1963); Weddle v. Commissioner,325 F.2d 849, 851 (2d Cir. 1963), affg. 39 T.C. 493 (1962); Samuel R. Milbank,51 T.C. 805, 817 (1969); sec. 1.166-5(b), Income Tax Regs.
*385 In determining whether there is a proximate relationship between a debt and the taxpayer's trade or business, it is not sufficient that there be a significant nexus between the two. Rather, the proper measure is that of the dominant motivation for signing the guarantee or indemnification agreements or otherwise creating the obligation. United States v. Generes,supra at 103; Oddee Smith, 60 T.C. 316, 317 (1973). In the case of advances pursuant to guarantees, the dominant motivation for undertaking the guarantee controls in determining the business or nonbusiness nature of the ensuing worthless debt. See United States v. Generes,supra at 99; Estate of Broadhead v. Commissioner,391 F.2d 841, 845 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. In the instant case, petitioner was the sole shareholder of R & W. By reason of his stockholding, he was not engaged in the corporation's trade or business as such. He was merely an investor seeking a profitable return from his investment. [4] Therefore, *386 to the extent that his advances of funds to R & W were made to protect or enhance his investment in the corporation, worthless debts arising from those advances must be categorized as nonbusiness bad debts. Whipple v. Commissioner,supra at 202. However, advances of funds by an investor to his corporation may be proximately related to an independent trade or business wholly apart from the activities of the corporation. See Whipple v. Commissioner,supra at 202; [5]Samuel R. Milbank,supra at 816. Should the taxpayer be involved in a trade or business apart from his corporate investment, losses arising from advances of funds to the corporation dominantly motivated by the protection of that independent trade or business and proximately related to it may qualify as a business bad debt. Weddle v. Commissioner,325 F.2d at 851; Kelly v. Patterson,331 F.2d 753, 756 (5th Cir. 1964); Samuel R. Milbank, supra at 816. *387 From the record, we think it quite clear that petitioner's guarantees of R & W's obligations were not dominantly motivated by, and therefore were not proximately related to, his construction business. The record simply will not support a finding that petitioner's concern for his construction company met the necessary standard of being his dominant motive for guaranteeing R & W's obligations. In an attempt to support his position, petitioner has painted a gloomy picture of his entry into an unsuccessful investment, with at all times a dominant and overriding concern for the reputation of his construction business. However, such a rationale, if followed to its logical conclusion, would lead us to find that petitioner made the R & W investment in order to insure the success of his construction business. In other words, petitioner has tried to show that his investment motives were at all times subordinate to his need to protect his construction company's bonding capacity. He asks us to overlook the fact that he initiated the R & W investment expecting to make a profit and, in so doing, was not dominantly motivated by concern for his construction business. Petitioner argues that, *388 even though he initially expected a profit, at some point during R & W's life, the protection of his construction business became the dominant motive for his advances of funds. However, attempting to determine that date in the light of the trial record would be both speculative and conjectural. As late as May 1969, petitioner demonstrated his still existing investment motive by guaranteeing performance of a 1-year employment contract between R & W and Henning, under which Henning was to receive a flat salary of $1,000 per month plus a percentage of R & W's profit. Clearly, such terms indicate an expectation of future profits on the part of both R & W and Henning and not an attempt by petitioner to gracefully terminate his R & W investment. Petitioner continued to guarantee the employment contract after R & W's assets were transferred to Snack Time in July 1969. By holding two-thirds of the Snack Time stock, petitioner continued his status as an investor in the cafeteria business. Only after petitioner caused R & W to repurchase the cafeteria's assets from Snack Time in October 1969 can it be safely concluded that petitioner was no longer trying to make a profit from his R & *389 W investment but, instead, was trying to find a way out. However, we cannot determine from the trial record which ones of the worthless debts were incurred after that date. As set out in our Findings, a record of payments from petitioner to R & W shows the dates of the payments and the amounts of the advances of funds, but provides us with no information concerning the reasons for the advances or R & W's use of the money. To the extent the advances of funds were made to discharge guarantees undertaken by petitioner when he was seeking a profit from R & W's operations, such loans would be investment-motivated and therefore nonbusiness debts. See United States v. Generes,405 U.S. 93, 99 (1972); Estate of Broadhead v. Commissioner,391 F.2d 841, 845 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. Because petitioner has failed to adequately establish that any of the worthless debts here involved were dominantly motivated and therefore proximately related to his construction business, we sustain respondent's determination that the debts were nonbusiness bad debts. Petitioner alternatively argues that the various advances to R & W should *390 be deductible as ordinary and necessary expenses under section 162(a). The essence of petitioner's argument is that the amounts he advanced to R & W were necessary to protect the integrity of his construction business. Petitioner's argument again raises the difficult issue of motivation as, in order to prevail, he must establish that the advances to R & W were motivated by the purpose of protecting his construction business rather than the promotion of his investment in R & W. James L. Lohrke,48 T.C. 679, 688 (1967); Cubbedge Snow,31 T.C. 585, 591 (1958). For the reasons discussed above, the record does not show which, if any, of the advances of funds made by petitioner to R & W were motivated by the need to protect his construction business. This factor distinguishes the instant case from those relied upon by petitioner, including among others, Lutz v. Commissioner,282 F.2d 614 (5th Cir. 1960), revg. a Memorandum Opinion of this Court; Allen v. Commissioner,283 F.2d 785 (7th Cir. 1960), revg. on this point a Memorandum Opinion of this Court; C. Doris H. Pepper,36 T.C. 886 (1961). In *391 each of those cases, the court was able to find that the payments under consideration were directly related to a trade or business. That we cannot do in the instant case. Accordingly, we hold that petitioner's claimed deduction is not allowable under section 162(a).
To reflect the foregoing, Decision will be entered for the respondent. Footnotes
1. /↩ All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.
2. /Sec. 166(d)(2) provides as follows: (d) Nonbusiness Debts.-- (2) Nonbusiness debt defined.--For purposes of paragraph (1), the term "nonbusiness debt" means a debt other than-- (A) a debt created or acquired (as the case may be) in connection with a trade or business of the taxpayer; or (B) a debt the loss from the worthlessness of which is incurred in the taxpayer's trade or business.↩
3. /SEC. 166. BAD DEBTS. (a) General Rule.-- (1) Wholly worthless debts. --There shall be allowed as a deduction any debt which becomes worthless within the taxable year. (2) Partially worthless debts. -- When satisfied that a debt is recoverable only in part, the Secretary or his delegate may allow such debt, in an amount not in excess of the part charged off within the taxable year, as a deduction. (b) Amount of Deduction.--For purposes of subsection (a), the basis for determining the amount of the deduction for any bad debt shall be the adjusted basis provided in section 1011 for determining the loss from the sale or other disposition of property. * * *
(d) Nonbusiness Debts.-- (1) General rule.--In the case of a taxpayer other than a corporation-- (A) subsections (a) and (c) shall not apply to any nonbusiness debt; and (B) where any nonbusiness debt becomes worthless within the taxable year, the loss resulting therefrom shall be considered a loss from the sale or exchange, during the taxable year, of a capital asset held for not more than 6 months. * * *↩
4. In Whipple v. Commissioner,373 U.S. 193, 202 (1963), the Court stated that: Devoting one's time and energies to the affairs of a corporation is not of itself, and without more, a trade or business of the person so engaged. ↩
5. In Whipple v. Commissioner,supra at 202, the Court stated that-- if the taxpayer demonstrates an independent trade or business of his own, care must be taken to distinguish bad debt losses arising from his own business and those actually arising from activities peculiar to an investor concerned with, and participating in, the conduct of the corporate business.↩