AGGIE L. MIZELL, INDIVIDUALLY AND AS A PERSONAL REPRESENTATIVE OF THE ESTATE OF BEULAH ISABELLE NETTLES, DECEASED, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Mizell v. Commissioner
Docket No. 13306-81.
United States Tax Court
T.C. Memo 1984-254; 1984 Tax Ct. Memo LEXIS 418; 48 T.C.M. (CCH) 83; T.C.M. (RIA) 84254; May 9, 1984. John S. Duss, for the petitioner. Judy K. Hunt, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in the income tax of the estate of Beulah Isabelle Nettles, deceased, for the calendar years 1973, 1974, 1975, 1976, 1977 and 1978 in the amounts of $27,500.59, $27,776.41, $27,992,91, $28,099.43, $31,893.16 and $33,156.45, respectively, and additions to tax under section 6653(b)[1] for these respective years of $13,750.30, $13,888.21, $13,996.46, $14,049.72, $15,946.58 and $16,578.23. Respondent also determined a deficiency in the tax of Beulah Isabelle Nettles, deceased, for the period January 1, 1979, through July 13, 1979, in the amount of $12,689.10 and an addition to tax for this period under section 6653(b) *419 of $6,344.55. By an amendment to answer, respondent alleged that the liability for taxes of Beulah Isabelle Nettles, deceased, for the years 1973 through the period ending July 13, 1979, were as follows: Additions to Tax
Year
Tax
Sec. 6653(b)
1973
$136,079
$68,040
1974
20,967
10,484
1975
19,183
9,592
1976
11,798
5,899
1977
8,121
4,061
1978
4,713
2,357
1979
1,178
589
The issues for decision are: (1) Whether, for each of the years 1973 through 1978, Beulah Isabelle Nettles failed to report income which she received and whether for the period January 1, 1979, through July 13, 1979, Aggie L. Mizell, as the personal representative of the estate of Beulah Isabelle Nettles, deceased, failed to report income received by Beulah Nettles during that period; (2) whether a part of the underpayment of tax resulting from the failure of Beulah Nettles to report all of her income for each of the years 1973 through 1978 and the failure of her personal representative to report all of Beulah Nettles' *420 income for the period January 1, 1979, through July 13, 1979, was due to fraud with intent to evade tax under section 6653(b) for each of these years; (3) whether the assessment and collection of the deficiency in income tax for each of the years 1973 through 1978 and for the period January 1 through July 13, 1979, are barred by the statute of limitations; and (4) whether the estate of Buelah Nettles is estopped by the doctrine of equitable estoppel from contending that Beulah Nettles earned in years prior to January 1, 1973, any part of the cash money found in her safe deposit boxes at the time of her death. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Aggie L. Mizell is the personal representative of the estate of Beulah Isabelle Nettles. At the time the petition in this case was filed, Ms. Mizell resided in Jacksonville, Florida. For each of the calendar years 1973 through 1978, Beulah Isabelle Nettles (hereinafter decedent), under the name of Beulah Player, filed a joint Federal income tax return with Eugene M. Player, with the Office of the Director, Southeast Internal Revenue Service Center, Chamblee, Georgia. For the period *421 January 1 through July 13, 1979, the personal representative of decedent's estate filed on behalf of the estate an individual income tax return for decedent. For approximately 50 years prior to her death on July 13, 1979, decedent was engaged in prostitution under various names, including the names Peggie Brown, Peggy Brown, Beulah Isabell VunCannon, Peggy Isabell Brown, Beulah Parramore Player, Beulah Isabella Player and Beulah Strickland. Prior to January 1, 1972, she was arrested on several occasions for vagrancy or prostitution. One of these arrests was under the name of Beulah VunCannon. Decedent was murdered on July 13, 1979. For the calendar years 1964 through 1969, Eugene M. Player filed Federal income tax returns in which he claimed exemptions for himself and his wife, and showed his wife as having no income. On the return for each of the years 1967, 1968 and 1969, he showed his wife's name as Beulah. For the year 1970, decedent, under the name of Beulah Player, filed a joint Federal income tax return with Eugene M. Player. In December 1973 and early 1974, an agent of the Office of Internal Revenue Service, Jacksonville, Florida, examined the Federal income tax *422 returns filed by decedent, under the name Beulah Player, jointly with Eugene Player for the years 1971 and 1972. An indirect method of proof was used in the audit of the Federal income tax returns of decedent and Eugene Player for these years. On the basis used by respondent, unreported income of $8,342 for 1971 and $14,312 for 1972 was shown. Tax deficiencies of $1,466 and $2,807, respectively, and additions to tax under section 6653(b) in the amounts of $733 and $1,403.50 were determined by respondent. On March 14, 1974, decedent and Eugene Player agreed to the assessment of these deficiencies and additions to tax for the calendar years 1971 and 1972 and delivered to the Office of Internal Revenue Service, Jacksonville, Florida, a $6,730.04 cash payment for the deficiencies and additions to tax. As of December 31, 1972, decedent held bank savings accounts with the following amounts on deposit: First Federal
#27032
$ 3,182.32
First Federal
#28264
19,500.49
Springfield Atlantic
#6531120
16,363.71
Marine National
#1-2650-1
14,343.55
Total
$53,390.07
During the course of the audit of decedent's 1971 and 1972 liabilities in late 1973 and early *423 1974, the examining agent asked decedent if she had any safe deposit boxes or a cash hoard in any amount, and she told him that she did not have any safe deposit boxes and that she kept no more than about $50 cash on hand at any one time. After he was given this information, the agent wrote out in handwriting the following statement, which was signed by decedent and Eugene Player: During the periods from Jan. 1, 1972 through Dec. 31, 1972 I had no more than $50.00 undeposited personal cash on hand and had only three savings accts--1 at the Springfield Atlantic $65,311.20 and 2 at the 1st Fed. Savings and Loan, nos. 28264 and 27032. I had no checking accounts during this period. Beulah Player E. M. Player After this statement was signed, Mr. Player called the Revenue agent and said his wife had forgotten about a savings account at the Marine National Bank and that he would bring the statements to the office that afternoon, January 2, 1974. Mr. Player told the agent that he and his wife had no more than $50 undeposited personal cash on hand between January 1, 1971, and December 31, 1971. After receiving the information from decedent and Mr. Player that decedent had *424 no safe deposit boxes, the agent mailed letters of inquiry to several banks in Jacksonville, Florida, asking whether Beulah Player or Eugene Player had a safe deposit box at the bank and whether they had bank accounts at the bank. Each of these banks responded that there were no bank accounts other than those previously disclosed to the agent by decedent and Eugene Player, and that there were no safe deposit boxes at the bank under the name of Beulah Player or Eugene Player. At the time of making this inquiry, the examining agent had the arrest record of decedent showing some of the names used by decedent other than Beulah Player. From December 31, 1972, through the date of her death, decedent owned three parcels of real estate, one on Beaver Street, one on East 31st Street, and one on Edison Avenue in Jacksonville, Florida. She owned no other real estate. In February 1975, decedent received the sum of $12,000 as the beneficiary of a life insurance policy on the life of her brother, Willie Nettles, who died in February 1975. On January 5, 1976, decedent purchased a 1976 Plymouth Fury automobile using the name Beulah I. Strickland, making a $2,000 downpayment to the seller of *425 the automobile. As of the date of her death, decedent owned jewelry, all of which was acquired prior to December 31, 1972, which was valued in the estate tax return filed for her estae on April 11, 1980, at $38,000. At the date of her death, decedent had the following sums of cash in safe deposit boxes at the banks indicated: Springfield Atlantic Bank
$ 70,000
Marine National Bank
226,010
Barnett National Bank
50,000
Atlantic National Bank
78,000
Total
$424,010
At the date of her death, decedent had the following amounts on deposit at the banks indicated: Marine National Bank
#012625010
$20,060
Barnett National Bank
Checking
30,000
Springfield Atlantic
Bank
#01-065311-20
28,442
Total
$78,502
On the income tax returns filed by decedent and Mr. Player for the years 1973 through 1978, gross income was reported in the amounts of $3,617, $3,584, $4,095, $4,423, $3,644 and $3,875, respectively. The income shown consisted of between $3,000 and $4,000 of interest and a small net amount of income from property rentals. The gross rentals reported ranged from $3,640 to $5,376 during these years. The only year in which any tax *426 was shown as due was $116 for the year 1973. For the period January 1 through July 13, 1979, decedent's personal representative reported that decedent had interest income of $2,061 and income from rentals of $1,675, making a total gross income of $3,736. The gross rentals shown for this period were $2,600. No tax was shown as due. On July 20, 1979, Aggie L. Mizell, decedent's sister, filed a Petition for Administration of decedent's estate, alleging that she was next of kin of decedent and entitled to Letters of Administration. On July 23, 1980, Letters of Administration were issued to her as personal representative of decedent's estate. Thereafter, Eugene M. Player filed a separate Petition for Administration, a Petition for Removal of the Personal Representative and Revocation of the Letters of Administration granted to decedent's sister. He alleged in his petition that he was the common-law husband of decedent and thus was the next of kin and entitled to the Letters of Administration as personal representative of decedent's estate. Hearings on the petition of Eugene M. Player were held in August and November 1979 and in January and February 1980. More than 50 witnesses *427 were called to testify and more than 40 exhibits were filed in evidence. On February 27, 1980, the judge of the circuit court in and for Duval County, Florida, after discussing the conflicting testimony given in the proceedings, entered an order holding that there was not a common-law marriage between decedent and Eugene M. Player and denied Mr. Player's petition. In the order denying Mr. Player's petition, the following is stated: Beulah Isabel Nettles, a/k/a Beulah Isabel Player, Beulah Isabel Parramore, Beulah VunCannon, Beulah I. VanCannon, Beulah Strickland, Joyce Whaley, and more generally known as Peggy Brown, died intestate on July 13, 1979, at the age of 65. She was a well-known prostitute and was still active in her profession at the time of her death. The decedent had accumulated a large estate consisting of $512,398.61 in cash, time certificates, savings and personal property. The cash was in a number of safe deposit boxes in various banks in Jacksonville. In addition, she owned real estate of the approximate value of $145,000.00. The total value of the estate is $657,398.61. In May 1980, an audit of the 1979 income tax return filed on behalf of decedent's estate *428 was begun and was expanded to include the calendar years 1973 through 1978. On December 9, 1980, the Revenue agent conducting the audit of decedent's tax liabilities for the years 1973 through 1979 was advised by the attorney for her estate that the estate had distributed $94,100 in cash and property to Eugene Player in settlement of a claim he made against the estate. On December 22, 1980, a petition was filed in the proceedings in Duval County with respect to decedent's estate for allowance of a personal representative's fee, an attorney's fee, authorization for sale of the remaining physical assets and distribution of the assets and discharge of the personal representative. On December 26, 1980, respondent mailed to the circuit court of Duval County a proof of claim against the estate showing estimated tax liability owed by decedent for the years 1973 through 1979 in the amount of $300,000. On January 20, 1981, a jeopardy assessment under section 6861 was made with respect to decedent in the amount of $341,857.81, which amount included income tax deficiencies, additions to tax under section 6653(b), and interest. On January 21, 1981, respondent mailed a Proof of Claim for Internal *429 Revenue Taxes to the circuit court for Duval County showing tax liability owed by decedent for the years 1973 through 1979 in the amount of $341,857.81. On January 22, 1981, the circuit court for Duval County entered an order for payment of compensation to the personal representative of decedent's estate, for payment of attorney's fees and for a partial distribution. Assets of the estate were in fact distributed pursuant to this order. The safe deposit box which decedent has at Marine National Bank of Jacksonville was acquired by her under the name Alice Cannon on December 12, 1973. The only entry shown as made into the box after it was acquired was on December 13, 1973. Decedent, from June 15, 1960, until the date of her death, had a safe deposit box at the Barnett National Bank of Jacksonville under the name of Beulah I. VunCannon. This box was entered by decedent a number of times during each of the years 1961 through 1973, one of the entries in 1973 being on December 10. It was entered twice in 1974, twice in 1976, and the last entry made was on June 12, 1979. No entries into the box were made in 1977 and 1978. From March 20, 1962, until the date of her death, decedent *430 had a safe deposit box at the Atlantic National Bank of Jacksonville under the name of Beulah Nettles. On March 11, 1974, the original box obtained under the name Beulah Nettles at the Atlantic National Bank was changed to another box. The only entry shown on the record of Atlantic National Bank into the changed box prior to decedent's death was on May 7, 1976. Decedent had a safe deposit box at the Springfield Atlantic Bank under the name of Janice I. Whaley. This box was obtained on December 10, 1973, was entered on December 11, 1973, and was entered on April 6, 1978, and April 7, 1978. The last entry into this Springfield Atlantic Bank safe deposit box prior to the date of decedent's death was the entry on April 7, 1978. Respondent mailed the statutory notice of deficiency to the personal representative of decedent's estate on March 17, 1981. In this notice of deficiency, respondent determined that decedent's gross income for each of the years 1973 through 1978 was $69,088, and for the period January 1 through July 13, 1979, was $34,544. In the notice of deficiency, decedent's income tax was computed on the basis that the unreported income received by decedent in each of *431 the years involved was received primarily from prostitution and therefore was subject to the self-employment tax. The tax was computed on the basis of an unmarried individual with one personal exemption and the standard deduction. In his amendment to answer, respondent determined that decedent had omitted income for the years 1973 through 1978 and the period January 1 through July 13, 1979, in the following amounts: Year
Omitted Income
1973
$279,778.58
1974
49,730.78
1975
45,894.17
1976
31,684.49
1977
22,171.92
1978
12,172.00
1979
4,420.15
This computation was arrived at by assuming that in each of the years 1973 through 1978, $7,692.24 of the $50,000 in the safe deposit box at the Barnett National Bank was income to decedent, and that $3,846.56 was decedent's income from the cash in this box the first 6 months of 1979. Respondent also included in decedent's income from the cash in the safe deposit box at the Atlantic National Bank $22,829.16 in each of the years 1973, 1974 and 1975, and $9,512.52 in the year 1976, making a total of $78,000 in this box at the date of decedent's death. Respondent determined that in each of the years 1973 through *432 1977, decedent had income of $13,333.32 with respect to the cash in the safe deposit box at the Springfield Atlantic Bank and in 1978 had $3,333.40 income with respect to this cash, making a total of $70,000 in that box at the date of decedent's death. To this respondent added $5,383.92 in 1973 and $1,346.12 in 1974 for the cash used in payment of the 1971 and 1972 income tax deficiencies and additions to tax. Respondent added $666.66 in each of the years 1973 and 1974 and $666.68 in 1975 because of the 1975 downpayment of $2,000 on the Plymouth automobile, and in each of the years 1973 through 1978 added $3,863.28 because of increases in savings accounts, and added for the period January 1 through July 13, 1979, $1,932.33 from this source. Respondent, for the years 1975, 1976, 1977 and 1978 reduced the otherwise determined income by $2,490.51, $2,716.92, $2,716.92, $2,716.92, respectively, for the life insurance proceeds received by decedent, and on this basis reduced the otherwise determined income for the period January 1 to July 13, 1979 by $1,358.73. OPINION The first two issues in this case are inter-related. The first is whether decedent failed to report income for *433 the years 1973 through 1978 and whether the personal representative of decedent's estate failed to report decedent's income for the period January 1, 1979, through July 13, 1979. The second issue is whether any understatement of tax resulting from any failure to report income for each of these years was due to fraud with intent to evade tax. Clearly, from the record here, decedent had income for each of the years 1973 through 1978 and for the period January 1 through July 13, 1979, which was not reported on her Federal tax returns. The record establishes that decedent was a prostitute during all the years here involved and received income from this occupation. However, on her tax returns she only reported her interest income and rental income for the years 1973 through 1978. The record here also shows the omission of income from the return filed by decedent's personal representative for the first 6-1/2 months of 1979. It has been stipulated that decedent was engaged in the occupation of being a prostitute during all the period here involved. No income from this occupation was reported on decedent's Federal income tax returns. Large amounts of cash were contained in safe deposit *434 boxes at the date of her death and there had been a substantial increase in the amount decedent had on deposit in banks from January 1, 1973, to the date of her death. The evidence is clear that decedent understated her income for each of the years 1973 through 1978 and that her income for the period January 1 to July 13, 1979, was understated. We so hold. Petitioner does not deny the understatement of income but merely argues as to the amount of the understatement. Petitioner has the burden of showing error in respondent's determination of decedent's income. Estate of Broadhead v. Commissioner,391 F.2d 841, 844 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. However, the burden of showing that there was an underpayment of tax and that some part of such underpayment is due to fraud is upon the Commissioner, and he must make this showing of fraud by clear and convincing evidence. Webb v. Commissioner,394 F.2d 366, 377 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. Papineau v. Commissioner,28 T.C. 54, 57 (1957). *435 The fraud which the Commissioner must show implies bad faith and intentional wrongdoing, with a specific intent to evade tax. Webb v. Commissioner,supra.
In the instant case, respondent has shown by clear and convincing evidence that an underpayment of the tax existed and that decedent's failure to report income from the practice of prostitution was due to fraud with intent to evade taxes. Decedent's tax returns for the years 1971 and 1972 had been investigated in late 1973 and early 1974, and decedent had been informed of her duty to report her income from prostitution. She had agreed to the tax and addition to tax under section 6653(b) as determined by respondent for these years. When decedent filed joint returns with Mr. Player for the years 1973 through 1978, reporting none of her income from the practice of prostitution, she clearly knew that she was under-reporting her income. The failure over so many years to report income, particularly after having been informed that the unreported income should be reported, is a clear indication of an intent to evade tax. In fact, petitioner does not argue that decedent's failure to report the major portion *436 of her income for each of the years 1973 through 1978, and her personal representative's failure to report the major portion of decedent's income for the first 6-1/2 months of 1979, was not due to fraud. The evidence in this case is so clear and convincing, that a part of the underpayment of tax in each of the years and for the period here in issue was due to fraud with intent to evade tax, that we need not prolong the discussion of this aspect of this case. Not only is there a failure to report income present here, but decedent made false statements to respondent's agents, concealed income, and kept funds in cash under assumed names. These facts support the conclusion that decedent's omission of a large portion of her income was made with intent to evade tax; we conclude that respondent has clearly established this fact. The real issue between the parties here is the amount of the taxable income omitted by or on behalf of decedent. Respondent initially divided the amounts of cash in the various safe deposit boxes at the date of decedent's death equally over the entire period here involved, and added to the amounts so determined a proration over this period of time of the increases *437 in decedent's cash in various bank accounts. Respondent made certain minor adjustments to these figures to arrive at an equal amount of unreported income for each of the years 1973 through 1978 and one-half that amount for the period January 1, 1979, through July 13, 1979. At the trial, evidence was introduced which showed that this proration could not be correct since at the date of her death decedent had $226,010 in cash in a safe deposit box in the Marine National Bank which had been opened on December 12, 1973, and entered only once before her death, that entry being on December 13, 1973. The record also showed that other safe deposit boxes which decedent had were entered on December 10 and 11 of 1973. In any event, the evidence is unmistakable that the $226,010 was either income which decedent received in the year 1973 or was money she had accumulated in prior years and placed in the safe deposit box in 1973. Respondent amended his answer to allege that the entire $226,010 in the safe deposit box at the Marine National Bank at the date of decedent's death was income to her in 1973. Respondent has a presumption of correctness with respect to the income of $69,088, which he *438 had determined in the notice of deficiency was decedent's gross income for 1973 as compared to $3,617 of income as reported on decedent's tax return. However, under his allegations in his amendment to answer, the burden is on respondent to establish that any amount in excess of the $69,088 determined in the notice of deficiency was income received by decedent in the year 1973. Not only has respondent totally failed to establish that decedent actually received more in adjusted gross income in 1973 than he determined in the notice of deficiency, the evidence that is in the record indicates to the contrary. The fact that decedent entered other safe deposit boxes at approximately the same time she opened the box at the Marine National Bank indicates that in fact the $226,010 she put in that bank in December 1973 was from amounts she had previously accumulated. Decedent had rented safe deposit boxes since the early 1960's. There is nothing in the record to even suggest that decedent's activities in 1973 differed from her activities in prior or subsequent years. In fact the stipulated fact that she engaged in prostitution during all these years indicates to the contrary. Respondent *439 relies solely on the statement written out by an Internal Revenue agent and signed by decedent in connection with the investigation of her 1971 and 1972 tax liabilities to establish the fact that decedent had not over $50 in cash as of January 1, 1973. This statement is, of course, evidence and is to be weighed along with the other evidence of record to determine whether the evidence establishes that decedent had only $50 in cash as of January 1, 1973. In our view, the evidence as a whole clearly indicates to the contrary of the statement made by decedent that at no time during the year 1972 did she have over $50 in cash. In connection with the same investigation, decedent told respondent's agent that she had no safe deposit boxes. This record clearly shows this statement to be false. The evidence of entry into other safe deposit boxes which she had maintained for some years around the time of the placing of the $226,010 in the Marine National Bank safe deposit box, indicates that decedent must have had some of this cash prior to January 1, 1973. The record also shows that decedent filed a joint return with Eugene Player for the year 1970 reporting only income from interest and *440 rent; for the years 1967 through 1969, and by inference the years 1964 through 1966, decedent filed no income tax returns, but rather, Eugene Player showed her on his returns as his unemployed wife with no income. The record is reasonably clear that from 1964 through 1970 decedent reported no income for tax purposes but during all of these years was engaged in prostitution, producing income from this occupation. The fact that decedent concealed receipt of income during these years is evidence that some of the cash transferred from other safe deposit boxes to the safe deposit box at the Marine National Bank was earned by decedent during years prior to 1973 and that certainly some of this cash was earned during the years 1964 through 1970. On the basis of this record, we conclude that the statement made by decedent to the Revenue agent, that at no time during the year 1972 did she have more than $50 in cash, written down by him and signed by decedent, was false. The evidence in this case does not sustain respondent's affirmative allegation that decedent's income for the year 1973 exceeded the $69,088 which respondent determined in the notice of deficiency was her income for that *441 year. Respondent, recognizing that the evidence might not support a finding that decedent in fact had only $50 in cash at January 1, 1973, has alleged that decedent's estate should be estopped to deny this fact under the doctrine of equitable estoppel. As was pointed out in Estate of Kingdon v. Commissioner,9 T.C. 838, 844 (1947), a party claiming equitable estoppel must show that there was a false representation or misleading silence in a statement of fact rather than an opinion or statement of law, that he was ignorant of the true facts and that he would be adversely affected by the statement made by the person against whom equitable estoppel was claimed. In Bartel v. Commissioner,54 T.C. 25 (1970), we discussed at some length the principle of equitable estoppel and the related principle that in tax matters a consistency of treatment of income items may be required. Considering the requirements of equitable estoppel and related principles as applied in tax cases, we conclude that the facts in this case do not support the application of such principles. *442 In the years 1971 and 1972, respondent used the statement by decedent of an amount of no more than $50 cash on hand to support his reconstruction of decedent's income for those years. Respondent in effect recognizes this but argues that he has been adversely affected by this statement by permitting tax years prior to 1971 to become closed and his records with respect to these years destroyed. He argues that he relied on the statement by decedent in permitting this to occur. Perhaps the simple answer to this argument is that respondent, who has the burden of proof on this issue, has totally failed to show that he is in any different position with respect to years prior to 1971 now than he was when his agent obtained the statement from decedent. At the time decedent signed this statement the statute of limitations, absent fraud, a 25 percent understatement of income or failure to file a return, had run with respect to all years prior to the year 1970, and it was close to the time the statute would run with respect to the year 1970. Respondent has not shown why decedent's return for 1970 was not included with the investigation of the years 1971 and 1972. Neither has respondent *443 shown any adverse affect he has suffered by any destruction he might have done of records for the years 1970 and prior years. The evidence in this record is reasonably clear that decedent filed no tax returns from 1964 through 1969 and that in 1970, as she had in 1971 and 1972, she filed a joint return with Eugene Player, reporting only interest income and rental income. In fact, it is difficult to understand why, when investigating decedent's tax liability for the years 1971 and 1972, respondent did not include in the investigation the year 1970. Certainly, this action was not because of a reliance on any statement made by decedent as to the small amount of cash she had on hand. Since respondent has failed to show two of the basic elements of equitable estoppel, namely that he was ignorant of the fact that decedent's income was not reported in years prior to 1971 when decedent made the statement as to her cash or that he was adversely affected by the statement, equitable estoppel is not applicable. There are also other reasons here to hold against respondent on his claimed equitable estoppel contention. Obviously, the agent did not believe decedent's statement that she did *444 not have any safe deposit boxes since he attempted to ascertain from various banks whether this statement was true. However, he only used the name Beulah Player in inquiring as to whether she had safe deposit boxes. The agent testified that he had decedent's arrest record when he was making his investigation of her tax liability for 1971 and 1972. This arrest record, which is in the record in this case, shows a use by decedent of the name Beulah Isabella VunCannon, along with a number of other names, including Beulah Player and Peggy Brown. Had the agent inquired as to the existence of safe deposit boxes under the name of Beulah VunCannon, which he was aware of, he would have located the safe deposit box at the Barnett National Bank of Jacksonville which was opened on June 15, 1960, by decedent. This discovery might have led him to inquire as to safe deposit boxes under other names. On this record, we conclude that petitioner is not estopped to deny that decedent had more than $50 cash on January 1, 1973. Having concluded that respondent failed in his burden of proof that decedent had income in 1973 in excess of the $69,088 he determined as her income in that year, we hold that *445 for the year 1973 decedent's income was $69,088, since petitioner has totally failed to meet the burden of showing to the contrary for the year 1973. Petitioner has sustained the burden of showing that no portion of the $226,010 cash in the Marine National Bank should be allocated to years after 1973. The record, however, shows that there were some entries into the Barnett National Bank safe deposit box during the years 1973, 1974, 1976 and 1979, and for this reason we conclude that respondent's distribution of the amounts in this box over the years here in issue is a reasonable allocation. See Estate of Bartlett v. Commissioner,22 T.C. 1228, 1232 (1954). However, since there was an entry into this box on December 10, 1973, close to the time the Marine National Bank box was open, we conclude that it is reasonable to determine income by distributing the amount found in the Barnett National Bank safe deposit box over only the years 1974, 1975, 1976, 1977, 1978 and the first six months of 1979, the last entry to that box being June 12, 1979, and hold that this amount should be so distributed. The record shows that the last entry by decedent into the safe deposit *446 box at Atlantic National Bank was on May 7, 1976, but does not show when all of the previous entries were made, although she had a safe deposit box at that bank from March 20, 1962. Decedent exchanged one box at this bank for another in 1974. Based on this evidence, we conclude it is reasonable to distribute the cash in this box at the date of decedent's date ratably over the years 1974, 1975, and the first six months of 1976, and hold that this allocation should be made. The safe deposit box at the Springfield Atlantic Bank was opened on December 10, 1973. This box was entered on December 11, 1973, and twice in 1978, once on April 6 and once on April 7. On this evidence we conclude that it is reasonable to distribute the cash in this box ratably over the years 1974, 1975, 1976, 1977 and for the period January 1, to April 7, 1978, and hold that this distribution should be made. Petitioner made no argument with respect to the method used by respondent to distribute the income he determined must have been earned by decedent because of the increase in the amounts of the cash in her bank accounts or the adjustments made by respondent because of the expenditure of $2,000 as a downpayment *447 on a Plymouth automobile, the $12,000 inheritance decedent received from her brother, and the cash used to pay 1971 and 1972 income taxes. The method used by respondent to distribute income from increases in bank accounts and the adjustments to income is reasonable and it is approved, limiting, however, total 1973 income to $69,088 as above stated. Because we have concluded that decedent filed fraudulent returns with intent to evade tax for each year here in issue that might otherwise be barred by the statute of limitations, we hold that none of the years here involved is barred by the statute of limitations. Decision will be entered under Rule 155.
Footnotes
1. Unless otherwise stated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩