T.C. Memo. 2001-63


UNITED STATES TAX COURT


ANDREW E. BLANCHE, JR., AND CYNTHIA D. BLANCHE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 5304-96.                          Filed March 15, 2001.


Cynthia D. Blanche, pro se.

<u>Candace M. Williams</u>, for respondent.


MEMORANDUM OPINION


COUVILLION, <u>Special Trial Judge</u>: Respondent determined
deficiencies of $3,851 and $2,058, respectively, in petitioners'
1991 and 1992 Federal income taxes.

The issues for decision are: (1) Whether, for 1991 and 1992,
petitioners are entitled to deductions for qualified residence
interest under section 163(a) and real property taxes under
section 164(a) in connection with certain residential real

property, referred to hereafter as the Foxbriar property; (2) whether petitioners are entitled to a casualty loss deduction under section 165(a) for the year 1991 with respect to the Foxbriar property; and (3) whether, for 1991, petitioners are entitled to a nonbusiness bad debt deduction under section 166(a) in connection with the Foxbriar property.[1]

Some of the facts were stipulated, and those facts, with the annexed exhibits, are so found and are incorporated herein by reference. At the time the petition was filed, petitioners' legal residence was Cibolo, Texas.

Prior to the years at issue, William S. Hewitt and his wife, Peggy L. Hewitt (the Hewitts), were owners of residential real property known as the Foxbriar property, which was located at Cibolo, Texas. On May 20, 1990, petitioners entered into an earnest money contract with the Hewitts for the purchase of the Foxbriar property. The earnest money contract contained a lease option addendum (the lease option), pursuant to which petitioners began occupying the Foxbriar property on June 25, 1990, as lessees.

Under the lease option, petitioners were to pay to the Hewitts $1,000 per month for 1 year, commencing July 1, 1990, and ending June 30, 1991. Of each $1,000 monthly payment, $250 would

---

[1] Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue.

be credited to petitioners at the end of the option period, to be applied toward the purchase price of the property. The purchase price for the property was to be $139,500 with a credit of $3,000 based on the $250 monthly payments by petitioners for 1 year. The closing date for the property was August 31, 1991. Additionally, under the earnest money contract, petitioners were required to pay earnest money of $100 initially, $2,500 on July 1, 1990, and $1,500 on January 1, 1991. Petitioners were also required to obtain outside financing for the purchase of the Foxbriar property.

On June 19, 1990, a standard inspection report was completed on the Foxbriar property, which listed several necessary repairs.[2] Despite repeated requests by petitioners to the Hewitts, no repairs were made to the Foxbriar property during the contract period, except for the roof, which an insurance company replaced in May 1991. Petitioners also expended approximately $969 for plumbing repairs during the contract period.

Petitioners made all payments required under the earnest money contract; however, petitioners failed to purchase the Foxbriar property on August 31, 1991, the closing date.

---

[2] The items found to not be in satisfactory condition ranged from minor problems such as a wobbly ceiling fan and a missing filter in an air return grille to more serious problems such as "bowed" roof structural supports and a broken diagonal roof support.

Petitioners did not complete the purchase because they believed that the Hewitts were required to repair the property in order to meet city inspection codes.[3] Petitioners investigated outside financing and were advised informally by two or three mortgage companies that financing would not be approved if the Foxbriar property failed to meet city inspection codes. To avoid what they believed would be a futile gesture, petitioners never formally applied for financing and, thus, were never approved or denied financing.[4]

The closing did not take place; consequently, the earnest money contract expired on June 30, 1991. Petitioners, however, continued in possession of the Foxbriar property and continued making the $1,000 monthly lease payments to the Hewitts.[5] Petitioners made their final lease payment to Mrs. Hewitt on April 10, 1992. During the period from September 1991 to April

---

[3] Under the earnest money contract, the Hewitts were not responsible for any repairs exceeding $1,500 in the aggregate.

[4] The earnest money contract stated that "On Seller's receipt of all loan approvals and inspection reports, Seller shall commence repairs". Petitioners never presented the Hewitts with any loan approval.

[5] The lease signed pursuant to the lease option stated that, after June 30, 1991, the lease would automatically continue on a month-to-month basis absent written notification of termination by either party. As of Sept. 1991, the payments were made out to Mrs. Hewitt only, at her instruction. Mrs. Hewitt informed petitioners that Mr. Hewitt had left her, and she had no knowledge of his whereabouts.

1992, petitioners discussed with Mrs. Hewitt the possibility of purchasing the Foxbriar property in its current condition by assuming the mortgage on the property and giving Mrs. Hewitt a $20,000 note in addition to the earnest money previously paid under the contract.  That arrangement was never carried out.

Sometime during May 1992, Mrs. Hewitt informed petitioners that she had ceased making the mortgage payments on the Foxbriar property and that the mortgage creditor, Lomas Mortgage U.S.A. (Lomas Mortgage), would initiate foreclosure proceedings if the delinquencies on the mortgage were not paid by June 12, 1992. Shortly thereafter, petitioners and Mrs. Hewitt reached an agreement for purchase of the Foxbriar property.  The terms of the agreement were: (1) Petitioners would purchase the property "as is"; (2) petitioners would assume the unpaid mortgage balance of $59,703.43; (3) petitioners would assume any other encumbrances on the property; (4) petitioners would pay the delinquencies on the mortgage in the amount of $7,269.73; and (5) the earnest money previously paid by petitioners would constitute additional consideration for the property.

An assumption agreement and deed (assumption documents) were drafted and forwarded to Mrs. Hewitt for her signature and for that of Mr. Hewitt.  The assumption documents were returned to petitioners via facsimile containing only the signature of Mrs. Hewitt, with a notarized signature date of July 2, 1992.  The

assumption documents were never signed by Mr. Hewitt, despite petitioners' efforts to obtain his signature. On August 24, 1992, petitioners recorded the original of the assumption deed, signed only by Mrs. Hewitt, with the County Clerk of Guadalupe County, Texas. Subsequently, petitioners began to make substantial repairs and improvements to the Foxbriar property.

Prior to the aforesaid events, on May 27, 1991, respondent assessed a Federal income tax liability against Mr. Hewitt for the 1990 tax year, which, as of March 1, 1996, totaled $25,276.20 plus the continuing accrual of interest. On January 18, 1994, respondent recorded a tax lien against the Foxbriar property in Guadalupe County, Texas.

Subsequently, respondent filed suit in the U.S. District Court for the Western District of Texas (District Court case) to reduce to judgment the aforementioned assessed tax liability against Mr. Hewitt, to foreclose on the tax lien encumbering the Foxbriar property, and to recover a judgment for any unpaid tax on the assessment/judgment not satisfied by the sale of the Foxbriar property.[6] Defendants in the District Court case were petitioners, Mr. Hewitt, Hank Wilson, and the mortgage creditor, Lomas Mortgage. Petitioners filed a counterclaim against Mr.

---

[6] United States v. Blanche, 79 AFTR 2d 97-1557, 97-1 USTC par. 50,448 (W.D. Tex. 1997), appeal dismissed as moot 169 F.3d 956 (5th Cir. 1999), rehearing en banc denied 184 F.3d 820 (5th Cir. 1999), cert. denied 528 U.S. 986 (1999).

Hewitt for specific performance under the earnest money contract. Mr. Hewitt filed a cross-claim against Lomas Mortgage and petitioners, alleging a conspiracy to deprive him of the Foxbriar property and seeking back rental payments for petitioners' occupancy thereof.

The District Court heard the case and later issued an opinion and judgment in which the District Court held that "Under Texas law, * * * [petitioners had] no valid interest in the [Foxbriar] property which would have attached before the tax lien was filed."[7] United States v. Blanche, supra. In other words, the District Court held that petitioners had no legal or equitable title to the Foxbriar property during 1991 and 1992. Respondent contends that this holding by the District Court precludes petitioners from asserting deductions in this case that would depend upon petitioners' having an ownership interest in the property.

On their 1991 Federal income tax return, petitioners claimed on Schedule A, Itemized Deductions (Schedule A), deductions of $2,370 for real property taxes and $5,372 for mortgage interest in connection with the Foxbriar property. Additionally, on Form

_____

[7] The District Court did, however, award petitioners $29,935.31 as restitution for improvements and repairs made to the Foxbriar property as well as for amounts paid to cure the mortgage default in 1992. That award, however, was based on unjust enrichment and was not based on petitioners' having an ownership interest in the property.

4797, Sales of Business Property, petitioners claimed a deduction of $9,719 for "Loss on Real Estate Investment (Northcliffe Subdivision)", in connection with the Foxbriar property. On Schedule A of their 1992 Federal income tax return, petitioners claimed itemized deductions of $2,839 for real property taxes and $9,102 for mortgage interest also related to the Foxbriar property.

In the notice of deficiency, respondent disallowed petitioners' 1991 itemized deductions for mortgage interest and real property taxes in their entirety but allowed petitioners other unrelated itemized deductions that did not exceed the standard deduction for that year. Consequently, petitioners were allowed the standard deduction. Additionally, for 1991, respondent disallowed the capital loss of $9,719 claimed by petitioners on Form 4797.

For 1992, respondent disallowed $6,351 of the claimed $9,102 mortgage interest deduction and $1,469 of the claimed $2,839 real property tax deduction.[8] Respondent allowed petitioners an additional unrelated itemized deduction; however, the allowed itemized deductions did not exceed the standard deduction for

---

[8]     Respondent allowed deductions for mortgage interest and property taxes paid in connection with the Foxbriar property for August through December 1992 on the premise that petitioners became personally liable to Lomas Mortgage in August 1992.

that year.  Consequently, petitioners were allowed the standard deduction for 1992.

Petitioners did not claim a casualty loss deduction on their 1991 Federal income tax return.  However, in their petition, petitioners alleged they were entitled to a casualty loss for 1991 of "$19,000, subject to limitations" in connection with the Foxbriar property.

In an amended answer, respondent affirmatively alleged that petitioners were collaterally estopped from claiming deductions relating to or attributable to the Foxbriar property because the District Court ruled that petitioners had neither legal nor equitable ownership of the Foxbriar property during the years at issue.  However, petitioners were effectively denied review of the District Court's judgment because it became moot on appeal, and their appeal was dismissed for that reason.  See supra note 6.  This Court, therefore, believes it more prudent to resolve the issues in this case on their merits rather than on the basis of collateral estoppel.

The first issue for decision is whether, for the years at issue, petitioners are entitled to deductions for qualified residence interest and real property taxes, in connection with the Foxbriar property, in excess of that allowed by respondent. Section 163(a) provides that there shall be allowed as a deduction all interest paid or accrued within the taxable year on

indebtedness. Section 163(h)(1), however, provides that, in the case of a taxpayer other than a corporation, no deduction shall be allowed for personal interest paid or accrued during the taxable year. Section 163(h)(2) defines "personal interest" to mean any interest allowable as a deduction other than, inter alia, "any qualified residence interest". Sec. 163(h)(2)(D). Thus, qualified residence interest is deductible under section 163(a). The term "qualified residence interest" is defined, in pertinent part, in section 163(h)(3)(A)(i), as any interest paid or accrued during the taxable year on "acquisition indebtedness with respect to any qualified residence of the taxpayer".

The "indebtedness" for purposes of section 163 must, in general, be an obligation of the taxpayer and not an obligation of another. Golder v. Commissioner, 604 F.2d 34, 35 (9th Cir. 1979), affg. T.C. Memo. 1976-150; Smith v. Commissioner, 84 T.C. 889, 897 (1985), affd. without published opinion 805 F.2d 1073 (D.C. Cir. 1986); Hynes v. Commissioner, 74 T.C. 1266, 1287 (1980). However, section 1.163-1(b), Income Tax Regs., provides, in pertinent part:

> Interest paid by the taxpayer on a mortgage upon real estate of which he is the legal or equitable owner, even though the taxpayer is not directly liable upon the bond or note secured by such mortgage, may be deducted as interest on his indebtedness. * * *

In Golder v. Commissioner, supra, the Court of Appeals for the Ninth Circuit, in affirming the Tax Court, stated that section 1.163-1(b), Income Tax Regs., does not create an exception to the rule of section 163(a) that interest is deductible only with respect to the indebtedness of the taxpayer but, rather, simply recognizes the economic substance of nonrecourse borrowing.

Additionally, as required by section 1.163-1(b), Income Tax Regs., the taxpayer must be the "legal or equitable owner" of the property. Where the taxpayer has not established legal, equitable, or beneficial ownership of mortgaged property, the courts generally have disallowed the taxpayer a deduction for the mortgage interest. See Bonkowski v. Commissioner, T.C. Memo. 1970-340, affd. 458 F.2d 709 (7th Cir. 1972); Song v. Commissioner, T.C. Memo. 1995-446; Estate of Broadhead v. Commissioner, T.C. Memo. 1966-26, affd. 391 F.2d 841, 848 (5th Cir. 1968).

This record reflects that petitioners had no legal obligation to Lomas Mortgage with respect to the Foxbriar property until August 1992.[9] Until such time, only the Hewitts

---

[9] In the notice of deficiency, respondent allowed petitioners a deduction for qualified residence interest paid by petitioners in connection with the Foxbriar property from August through December 1992. However, since the amount of such allowed interest deduction, coupled with the other allowed itemized deductions for 1992, failed to exceed the standard deduction, petitioners were allowed the standard deduction for that year.

were liable to Lomas Mortgage for payment of the mortgage on the Foxbriar property. Moreover, at least through May 1992, petitioners paid no amounts to Lomas Mortgage; rather, from July 1990 through April 1992, petitioners were making lease payments of $1,000 per month directly to the Hewitts. Thus, it cannot be said that petitioners paid any interest on the Foxbriar property at least through May 1992.

Petitioners contend that the $5,372 deducted on their 1991 return for mortgage interest represents one-half of the total interest paid on the Foxbriar property for 1991. The record in this case is unclear as to how petitioners determined the amount of interest paid on the Foxbriar property for that year, and the manner in which petitioners calculated that they were entitled to a deduction for one-half of that amount. The record is explicit, however, that petitioners paid no interest on the Foxbriar property during 1991. The record shows that, during 1991, petitioners paid nothing more than lease payments (and earnest money payments) directly to the Hewitts in connection with the Foxbriar property.[10] Whether or not the Hewitts used the monthly lease payments from petitioners to make mortgage payments on the Foxbriar property is of no consequence in this case. The Federal

---

[10] It is notable that, on Schedule A of their 1991 return, petitioners reported that the $5,372 in mortgage interest for which they claimed a deduction was paid to Peggy L. Hewitt of Tacoma, Washington.

income tax benefits of mortgage interest payments do not flow through to petitioners from the Hewitts. The only taxpayer entitled to a mortgage interest deduction on the Foxbriar property for 1991 is the taxpayer who actually paid the interest as the debtor to Lomas Mortgage. Petitioners were not the debtors during 1991 and did not pay the interest during that year. A similar analysis applies to the deduction of real estate taxes for 1991. See discussion, infra.

For 1992, petitioners claimed a deduction for all of the mortgage interest paid on the Foxbriar property during that year. However, through at least April 1992, petitioners paid only $1,000 in monthly rent to Mrs. Hewitt. As discussed previously, petitioners are not entitled to mortgage interest deductions (or real property tax deductions) in connection with these lease payments because they did not actually pay any mortgage interest (or real property taxes) through at least May 1992.

Sometime after May 1992, petitioners paid $7,269.73 to Lomas Mortgage to cure the mortgage default. However, if a taxpayer pays mortgage interest that accrued prior to the date upon which the taxpayer becomes the legal or equitable owner of the subject property, that amount is not currently deductible. See Koehler v. Commissioner, T.C. Memo. 1978-381. Moreover, it is notable that the District Court awarded petitioners restitution for amounts paid to cure the mortgage default in 1992.

Not until August 1992 did petitioners begin making regular mortgage payments directly to Lomas Mortgage in connection with the Foxbriar property. From August through December 1992, petitioners actually paid mortgage interest and real property taxes on the Foxbriar property. Respondent allowed petitioners the corresponding deductions for these payments.

The Court deems it prudent to also examine petitioners' ownership interest, if any, in the Foxbriar property during the years at issue. State law determines the nature of property rights, and Federal law determines the appropriate tax treatment of those rights. See United States v. National Bank of Commerce, 472 U.S. 713, 722 (1985); United States v. Rodgers, 461 U.S. 677, 683 (1983); Aquilino v. United States, 363 U.S. 509, 513 (1960). Thus, whatever rights or interests, if any, petitioners held in the Foxbriar property during the years at issue must be determined by applying applicable Texas law. It is well settled under Texas law that legal title to real property does not pass to a purchaser under a contract of sale until the deed to the property is delivered. Leeson v. City of Houston, 243 S.W. 485, 488 (Tex. Commn. App. 1922, judgment adopted). The record reflects that no deed to the Foxbriar property was delivered to petitioners prior to August 1992. Thus, the Court finds that petitioners had no legal title to the Foxbriar property prior to August 1992.

However, a taxpayer becomes the equitable owner of property when he assumes the benefits and burdens of ownership. See Baird v. Commissioner, 68 T.C. 115, 124 (1977). The time at which a taxpayer has assumed the benefits and burdens of ownership is a question of fact in each case. See Koehler v. Commissioner, supra.

Petitioners contend that they were equitable owners of the Foxbriar property during both of the years at issue. Petitioners argue that they had an option contract with the Hewitts for the purchase of the Foxbriar property, which became an executory contract for sale/purchase upon petitioners' exercise of their option. At that time, petitioners argue, they became equitable owners of the Foxbriar property. Petitioners contend they became equitable owners of the property no later than June 30, 1991, by their acts of "signing the earnest money contract and paying the $100 and $2,500, setting the closing date, and subsequent acts of making all monthly payments and paying the additional $1,500". Petitioners contend that this argument is fortified by the fact that they took possession of the property in June 1990 and maintained possession through 1997. In support of their claim to equitable title, petitioners rely on the Texas Supreme Court case of Sinclair Ref. Co. v. Allbritton, 218 S.W.2d 185 (Tex. 1949).

Petitioners' reliance on the Sinclair Ref. Co. case is misplaced. The contract at issue in Sinclair Ref. Co. was a lease contract containing a purchase option clause, which gave

the lessee a right to purchase the leased property under certain conditions and within a certain time limitation. The lease contract also contained a purchase refusal clause, which gave the lessor the right to notify the lessee of a third-party offer to purchase the property. The lessee then had a certain time period in which to purchase the property on the same terms offered by the third party. If the lessee failed to purchase, the lessor then had a right to sell the property to the third party, subject to the leasehold interest of the lessee. During the term of the lease (which had been properly extended under the terms of the contract), the lessee mailed a proper notification form stating that it exercised its purchase option. Four days later, the lessor notified the lessee of a bona fide purchase offer from a third party, which was $5,500 higher than the purchase option price. The issue before the court was whether the delivery of the lessee's notice formed a vendor/purchaser relationship between the parties and thus nullified the provisions of the purchase refusal clause. The Supreme Court of Texas held that, under the terms of that particular lease contract, the act of the lessee's giving proper and valid notice to the lessor did create a valid and enforceable contract for a sale between the lessor and the lessee, and, thus, the lessee, upon tender of the purchase price, was entitled to specific performance under the terms of the purchase option clause.

In the instant case, petitioners and the Hewitts entered into a contract for the sale of the Foxbriar property, with an

option for petitioners to lease the property prior to the closing date, rather than an option to purchase. The language of the earnest money contract bound petitioners to purchase and the Hewitts to sell the Foxbriar property on or before the closing date. This is evidenced by the terms of the contract requiring that, in the event of default on the part of the purchaser, the seller could either sue for specific performance or retain the earnest money as liquidated damages. It is well settled under Texas law that a contract for sale exists when the seller has both of these remedies. See Gala Homes, Inc. v Fritz, 393 S.W.2d 409, 411 (Tex. Civ. App. 1965)(citing Paramount Fire Ins. Co. v. Aetna Cas. & Surety Co., 353 S.W.2d 841, 843 (Tex. 1962) and Moss v. Wren, 113 S.W. 739 (Tex. 1908)); Tabor v. Ragle, 526 S.W.2d 670, 675 (Tex. Civ. App. 1975); Broady v. Mitchell, 572 S.W.2d 36, 40 (Tex. Civ. App. 1978).

The holding in Sinclair Ref. Co. v. Allbritton, supra, with respect to a purchase option in a lease contract is inapplicable to the contract for sale in the instant case. Sinclair Ref. Co. addresses the conditions under which a lease contract with an option to purchase becomes a contract for sale. In the instant case, the issue is not whether petitioners entered into a valid contract for purchase of the Foxbriar property. Clearly, they did so. Rather, the question is whether petitioners obtained equitable title to the Foxbriar property. Sinclair Ref. Co. does not address that question. Moreover, the holding in Sinclair

Ref. Co. was made specific to the terms of the contract at issue therein and would not apply generally to all contracts, particularly not to a contract for sale as existed in this case.

Petitioners also rely on the case of Boykin v. Commissioner, 344 F.2d 889 (5th Cir. 1965), for the proposition that, although legal title to real property does not pass to a purchaser under a contract of sale until actual delivery of a deed to the property, a purchaser is vested with equitable title from the date of the contract for sale or from the date the purchaser takes possession. Petitioners' reliance on Boykin is misplaced. In Boykin, the Court of Appeals for the Fifth Circuit (Fifth Circuit), to which an appeal in this case would lie, stated:

> under Texas law, a purchaser of realty ordinarily gets equitable title with the execution of a binding contract of sale. [Footnote omitted.] Of course it is often said that equitable title does not pass where the contract is by its terms expressly conditional. North Texas Realty & Construction Co. v. Lary, Tex. Civ. App., writ refused, 1911, 136 S.W. 843; 52 Tex. Jur. 2d Specific Performance § 48. And pointing out that "A contract may be conditional in its inception as to one party and unconditional as to the other," that text speaks in terms of the right to specific performance not being available prior to the time the equitable title passes. Ibid. In other words, the right to specific performance resting on an equitable right frequently measures the time the equitable right comes into being. [Emphasis added.]

Boykin v. Commissioner, supra at 892. Under Texas law, a party to a contract is not entitled to specific performance where that party materially breaches the contract by failing to meet a

contract requirement.  See Cowman v. Allen Monuments, Inc., 500 S.W.2d 223, 226 (Tex. Civ. App. 1973); Hudson v. Wakefield, 645 S.W.2d 427, 430 (Tex. 1983).  In the case here, petitioners materially breached the earnest money contract by failing even to attempt to obtain outside financing, and, thus, they were not entitled to specific performance.[11]  Since, under Texas law, the right to specific performance resting on an equitable right measures the time the equitable right comes into being, it is clear that equitable title to the Foxbriar property did not pass to petitioners prior to August 1992.

Moreover, the facts and circumstances surrounding the contract in Boykin v. Commissioner, supra, are clearly distinguishable from those in the instant case.  Under the contract at issue in the Boykin case, the "taxes for the current year, current rents, insurance, interest (if any), and delay rentals on oil and/or gas leases" were to be prorated as of the

---

[11]  Petitioners assert that their failure to formally apply for financing resulted from the Hewitt's failure to make repairs that petitioners believed were necessary to comply with city inspection codes.  As stated previously, supra note 4, the earnest money contract provided that "On Seller's receipt of all loan approvals and inspection reports, Seller shall commence repairs".  Petitioners never presented the Hewitts with any loan approval (or any loan refusal) because they never formally applied for financing.  The Hewitts were required to do nothing further under the contract until petitioners applied for financing and were either approved or denied the same. Petitioners' failure to apply for outside financing and to tender the purchase price constituted a breach of the earnest money contract, regardless of their reasons therefor and, thus, deprived them of the right to specific performance by that contract.

date of the contract, rather than the closing date.  The purchaser agreed to lease back the property to the seller, for agricultural purposes, for an annual cash rent of $2,500, which was accomplished.  At closing, the purchaser was credited an amount of rent for the farm for the precise number of days from execution of the contract to the closing date.  Additionally, the purchaser paid interest on his note to seller from the date of the contract.  Considering all the aforementioned facts, the Fifth Circuit stated that the contract with the addendum and the "conduct of the parties reveal that for all practical purposes * * * [the purchaser] was possessed of the benefits and burdens of ownership at the critical time [i.e., execution of the contract]."  Boykin v. Commissioner, supra, at 894.

In sharp contrast, the earnest money contract in the instant case expressly provided:

> taxes, flood and hazard insurance * * * , rents, maintenance fees, interest on any assumed loan and any prepaid unearned mortgage insurance premium which has not been financed as part of any assumed loan * * * shall be prorated through the Closing Date.  If Buyer elects to continue Seller's insurance policy, it shall be transferred at closing. [Emphasis added.]

Additionally, the contract provided that, if the Foxbriar property was damaged or destroyed by fire or other casualty, the Hewitts were to restore the property to its previous condition no later than the closing date.  In other words, until the time of

closing, the Hewitts bore the risk of loss with respect to the property.

Although petitioners had possession of the property as tenants or lessees, they were not entitled to possession as owners until the closing date. Under the residential lease signed by the parties, petitioners were prohibited from: (1) Subleasing or assigning the Foxbriar property; (2) making any improvements to the property without written permission; (3) repairing a vehicle on the property without written permission; (4) conducting any business on the property, including child care; (5) permitting more than four vehicles on the property without written permission; and (6) storing a nonoperative vehicle on the property. Moreover, the terms and conditions under which petitioners eventually purchased (or attempted to purchase) the property from Mrs. Hewitt differed from those originally set out in the earnest money contract. Analyzing the facts of the instant case under Texas law and the Fifth Circuit's reasoning in Boykin v. Commissioner, 344 F.2d 889 (5th Cir. 1965), the conduct of the parties fails to suggest that petitioners, for practical purposes, were possessed of the benefits and burdens of ownership prior to August 1992.

In determining whether the benefits and burdens of ownership have passed to a purchaser, this Court has often considered whether the purchasers: (1) Had the right to possess the property and to enjoy the use, rents, and profits thereof; (2) had the

duty to maintain the property; (3) were responsible for insuring the property; (4) bore the risk of loss of the property; (5) were obligated to pay taxes, assessments, and charges against the property; (6) had the right to improve the property without the seller's consent; and (7) had the right to obtain legal title at any time by paying the balance of the purchase price.  See Derr v. Commissioner, 77 T.C. 708, 724-725 (1981); Ryan v. Commissioner, T.C. Memo. 1995-579.  Petitioners had the right to possess the property but were prohibited from renting out or subleasing the property.  Petitioners had a duty, as lessees, to maintain the property in a reasonable condition and to repair certain damage caused by them; however, petitioners were not required to insure the property or bear the risk of loss. Petitioners were not obligated to pay taxes, assessments, or charges against the property, nor did they have the right to improve the property without written consent.  Analyzing these factors, petitioners did not possess the benefits and burdens of ownership prior to August 1992.  See also Koehler v. Commissioner, T.C. Memo. 1978-381.

On this record, the Court finds that petitioners were mere lessees of the Foxbriar property and did not have the benefits and burdens of ownership so as to make them equitable owners of the property until August 1992, the time at which they assumed liability to Lomas Mortgage.  Thus, on this record, the Court

holds that petitioners held no legal or equitable title to the Foxbriar property prior to August 1992.

Petitioners' lack of any legal or equitable ownership interest in the Foxbriar property prior to August 1992 precludes their entitlement to a deduction for qualified residence interest under section 163(a) during this time.  As stated previously, section 1.163-1(b), Income Tax Regs., requires that the taxpayer be the "legal or equitable owner" of the property.

That same rationale applies to the real estate property taxes.  Real property taxes are generally deductible in the taxable year within which they are paid or accrued.  See sec. 164(a)(1).  However, no deduction is allowed to the extent that real property taxes are treated as imposed on another taxpayer. See sec. 164(c)(2); sec. 1.164-1(a), Income Tax Regs.; Loria v. Commissioner, T.C. Memo. 1995-420.

As stated earlier, petitioners held no legal or equitable title to the Foxbriar property prior to August 1992.  Moreover, there is no evidence in the record to suggest that the real property taxes at issue were paid by or imposed on anyone other than the Hewitts through August 1992.[12]

---

[12]    In the notice of deficiency, respondent allowed petitioners a deduction for real property taxes paid by petitioners in connection with the Foxbriar property from Aug. through Dec. 1992.  However, since the amount of such allowed property tax deduction, coupled with the other allowed itemized deductions for 1992, failed to exceed the standard deduction, petitioners were allowed the standard deduction for that year.

Consequently, the Court holds that, for the years at issue, petitioners are not entitled to deductions for qualified residence interest or real estate taxes in connection with the Foxbriar property in excess of that allowed by respondent for 1992. Respondent is sustained on this issue.

The second issue for decision is whether petitioners are entitled to a casualty loss deduction for 1991 in connection with the Foxbriar property. In December 1991, the swimming pool located on the Foxbriar property was damaged due to excessive rains and flooding. This damage was not repaired until 1994, when petitioners expended $15,650 to repair the damage and make further improvements to the pool.[13] As a part of its judgment, the District Court ordered that petitioners be reimbursed from the foreclosure proceeds of the Foxbriar property $29,935.31, which would prime the Federal tax lien. That award included the following amounts relating to petitioners' claimed casualty loss:

| | |
|---|---|
| Pool improvements/repair | $15,650.00 |
| Fence repair/replacement | 637.00 |
| Yard clearing/cleaning | 293.50 |
| Total | $16,580.50 |

---

[13] The invoice from the pool company states that petitioners paid $15,650 for repairs and improvements to the pool. Petitioners also submitted invoices for $637 for fence installation, $250 for yard cleaning around yard and pool, and $43.50 for trash hauling. The Court does not consider these expenses as repairs to the pool, particularly since "clean site" was a task included in the contract with the pool company.

For the year 1991, petitioners did not claim a casualty loss on their return; however, in their petition they alleged entitlement to a casualty loss deduction of $19,000, subject to limitations.  On brief, petitioners claimed this item to be $16,580.50 as allowed by the District Court.  The record contains assertions by petitioners that the District Court award was discharged in bankruptcy by Mr. Hewitt; however, no evidence was presented to show any such bankruptcy discharge of this debt or the timing thereof.  Moreover, no evidence was presented to show whether the proceeds from the foreclosure sale satisfied this claim that primed the Federal tax lien.

Section 165(a) provides that there shall be allowed as a deduction any loss sustained during the taxable year and not compensated for by insurance or otherwise.  In particular, section 165(c)(3) allows a deduction to an individual for loss of property not connected with a trade or business or a transaction entered into for profit, if such loss arises from fire, storm, shipwreck, or other casualty, or from theft.  Personal casualty or theft losses are deductible only to the extent that the loss exceeds $100 and 10 percent of adjusted gross income.  See sec. 165(h)(1) and (2).  Such losses, moreover, are deductible as itemized deductions on Schedule A of the taxpayer's return.  In this case, petitioners do not contend that the subject property was ever used in a trade or business or a transaction entered into for profit.

A loss may be deducted only by the taxpayer who sustained it.  If the taxpayer is not the owner of the property, the taxpayer generally cannot claim a deduction for a casualty loss relating to that property.  See Wayno v. Commissioner, T.C. Memo. 1992-53, affd. without published opinion 12 F.3d 1111 (9th Cir. 1993).  This Court has held that petitioners held no legal or equitable title to the Foxbriar property during either of the years at issue.  This includes the swimming pool located on the Foxbriar property.

Moreover, the measure of a casualty loss, as provided by section 1.165-7(b)(1), Income Tax Regs., is generally the lesser of (1) the fair market value of the property immediately before the casualty reduced by the fair market value of the property immediately after the casualty, or (2) the amount of the adjusted basis prescribed in section 1.1011-1, Income Tax Regs., for determining loss from the sale or other disposition of the property.  The taxpayer bears the burden of proving the amount of his basis.  See Millsap v. Commissioner, 46 T.C. 751, 760 (1966), affd. on other issues 387 F.2d 420 (8th Cir. 1968).  A loss cannot be computed where the taxpayer's basis in the property is not proven.  See id.; Fisher v. Commissioner, T.C. Memo. 1986-141; sec. 1.165-1(c), Income Tax Regs.  Petitioners held no basis in the Foxbriar property during 1991, the year in which the damage to the swimming pool occurred.  Moreover, the record is devoid of any evidence that would tend to indicate petitioners

made any capital expenditure in connection with the Foxbriar swimming pool prior to 1994.

Petitioners rely on Rev. Rul. 73-41, 1973-1 C.B. 74, for the proposition that casualty loss deductions can be allowed to mere lessees. Petitioners' reliance on this revenue ruling is misplaced. The taxpayer in the cited revenue ruling was a lessee of residential property who, under the terms of the lease, was required to surrender the property in good condition at the termination of the lease. A fire severely damaged much of the property just prior to the lease expiration, and the taxpayer failed to surrender the property in good condition. The taxpayer denied liability for the damage, and the lessor sued. A judgment was rendered against the taxpayer. The ruling held that the "loss sustained upon payment of the judgment was directly attributable to the fire", and, thus, the taxpayer was entitled to a casualty loss deduction with respect thereto.

Petitioners in the instant case were not required, under their contract with the Hewitts, to repair the damage to the swimming pool and had no judgment rendered against them with respect to the swimming pool damage, an element which appears to have been essential in the revenue ruling. Moreover, it is well established that "the authoritative sources of Federal tax law are in the statutes, regulations, and judicial decisions and not in * * * informal [IRS] publications." Zimmerman v. Commissioner, 71 T.C. 367, 371 (1978), affd. without published

opinion 614 F.2d 1294 (2d Cir. 1979); accord Adler v. Commissioner, 330 F.2d 91, 93 (9th Cir. 1964); Green v. Commissioner, 59 T.C. 456, 458 (1972); Aldridge v. Commissioner, 51 T.C. 475, 482 (1968).

Finally, this Court has previously stated that "damage to property which one is leasing entitles one to a deduction for the loss sustained to the leasehold interest." Fryer v. Commissioner, T.C. Memo. 1974-77. However, petitioners had no basis in their leasehold interest on the Foxbriar property. See Fryer v. Commissioner, supra. Thus, the Court is unable to compute or allow petitioners a deduction for any loss to a leasehold interest. See Millsap v. Commissioner, supra; Fisher v. Commissioner, supra; sec. 1.165-1(c), Income Tax Regs.

On this record, the Court holds that petitioners are not entitled to deduct a casualty loss for 1991 in connection with the Foxbriar property.

The final issue for decision is whether petitioners are entitled to a deduction for a nonbusiness bad debt loss in connection with the Foxbriar property for 1991. Petitioners claimed on their 1991 Federal income tax return, on Form 4797, Sales of Business Property, a loss of $9,719 in connection with the Foxbriar property. That amount consisted of the following items:

| | |
|---|---|
| Earnest money payments made on 7/1/90 and l/1/91 | $4,000 |
| The $250 portion of the lease payments each month that were to be applied to the purchase price | 4,750 |
| Plumbing repairs made during contract period | 969 |
| Total | $9,719 |

On brief, petitioners increased the amount claimed to $9,819 to include the $100 amount paid when the earnest money contract was entered into.  Although the amount claimed on their 1991 return was based on a loss from the sale or exchange of a capital asset, petitioners on brief contend that the $9,819 was a nonbusiness bad debt under section 166 instead of a loss from the sale or exchange of a capital asset.

In general, section 166(a) allows a deduction for any debt that becomes worthless during the taxable year.  However, section 166 distinguishes between business bad debts and nonbusiness bad debts.  See sec. 166(d); sec. 1.166-5(b), Income Tax Regs. Business bad debts may be deducted against ordinary income to the extent that such debts become wholly or partially worthless during the year.  In contrast, nonbusiness bad debts may be deducted, but only as short-term capital losses, and only if the debts are wholly worthless in the year claimed.  Petitioners acknowledge that the claimed debt would be characterized as a nonbusiness bad debt.

A deduction for a bad debt is limited to a bona fide debt. See sec. 1.166-1(c), Income Tax Regs.  A bona fide debt is defined as one that arises from a debtor-creditor relationship

based upon a valid and enforceable obligation to pay a fixed or determinable sum of money. See sec. 1.166-1(c), Income Tax Regs. A taxpayer must establish the validity of a debt before any portion of it may be deducted under section 166. See American Offshore, Inc. v. Commissioner, 97 T.C. 579, 602 (1991); sec. 1.166-1(c), Income Tax Regs.

With respect to the money paid to the Hewitts under the earnest money contract,[14] petitioners breached the earnest money contract with the Hewitts, and petitioners were, therefore, not entitled to a recovery of those moneys under the terms of the contract. Those moneys were forfeited as liquidated damages to the Hewitts when petitioners breached the contract. Moreover, the Hewitts were not unjustly enriched by the payments under the contract because petitioners had a contractual duty to pay those amounts, and there was a possibility those moneys would be forfeited if petitioners breached the contract. Therefore, the Court finds that those moneys clearly did not constitute a bona fide debt owed by the Hewitts to petitioners.

With respect to the monthly payments made by petitioners to Mrs. Hewitt and Lomas Mortgage after the expiration of the earnest money contract, petitioners have not shown that they constituted more than fair rental value payments for petitioners'

---

[14] This includes the $4,100 in earnest money payments as well as the $250 portions of the $1,000 monthly payments made prior to the expiration of the earnest money contract, which were to have been applied toward the purchase price.

occupancy of the Foxbriar property after the expiration of the earnest money contract and also during the time they believed they were assuming the property. Thus, the Court finds that these moneys did not constitute a bona fide debt owed by the Hewitts to petitioners.

With respect to the $969 in plumbing repairs, petitioners had a potential claim for reimbursement of these moneys in 1991. This amount was included as a part of the $29,935.31 awarded to petitioners in the 1997 District Court decision as restitution for improvements and repairs made to the Foxbriar property. Thus, the $969, among other amounts, gave rise to a bona fide debt owed to petitioners by the Hewitts (that was reduced to judgment) in 1997 rather than in 1991. There is insufficient evidence in the record to determine whether or not this debt became worthless and, if so, in what year.[15] Also, as noted earlier, the proceeds from the foreclosure sale were supposed to have covered this item. This Court is certain, however, that the $969 was not a worthless debt in 1991 or 1992, and this Court's review of petitioners' tax liability is limited to the years at issue in this case.

---

[15] Vague assertions were made by petitioners that Mr. Hewitt discharged this debt in bankruptcy; however, no indication was given as to the year in which the debt was discharged, and no documentary evidence was offered to prove the discharge.

On this record, the Court holds that petitioners are not entitled to the claimed nonbusiness bad debt deduction for 1991.

<u>Decision will be entered</u>

<u>for respondent.</u>